# Illinois Official Reports

## Appellate Court

---

### *People v. Morales*, 2019 IL App (1st) 160225

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ISMAEL MORALES, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Nos. 1-16-0225, 1-16-0323 cons. |
| Filed | June 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-3180; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jonathan Yeasting, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Mason and Justice Pierce concurred in the judgment and opinion. |

¶ 1    Ismael Morales was convicted, along with five codefendants, of the 2007 murder and robbery of Francisco Reyes. We have decided a number of appeals involving this offense. See *People v. Roman*, 2016 IL App (1st) 141740 (affirming first-stage dismissal of Daniel Roman's postconviction petition); *In re Omar M.*, 2014 IL App (1st) 100866-B (direct appeal of minor codefendant, affirming adjudication and disposition); *People v. Lopez*, 2014 IL App (1st) 102938-B (direct appeal of codefendant Carlos Lopez, remanding for a new trial); *People v. Roman*, 2013 IL App (1st) 102853 (direct appeal of codefendant Daniel Roman, affirming conviction and sentence); *People v. Roman*, 2013 IL App (1st) 110882 (direct appeal of codefendant Martin Roman, remanding for a new trial); *People v. Morales*, 2012 IL App (1st) 101911 (Morales's direct appeal, affirming conviction and sentence). Here, we are concerned with Morales's appeal from the circuit court's first-stage dismissal of his postconviction petition.

¶ 2    In that petition, Morales claimed that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the existence of an agreement between the State and its main witness, Francisco Garcia, for the State's assistance in Garcia's immigration matters in exchange for his trial testimony. The petition also raises a claim of actual innocence based on the affidavit of Victor Redding, who claimed to have witnessed the attack on Reyes and claimed to know that Morales was not one of the participants.

¶ 3    We find the petition makes an arguable claim of a *Brady* violation. We reverse the first-stage dismissal of Morales's postconviction petition and remand for second-stage proceedings consistent with the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)).

¶ 4                                    I. BACKGROUND

¶ 5    Our decision in Morales's direct appeal (and the appeals in his codefendants' cases) sets out the details of the offense and the case history in detail. *Morales*, 2012 IL App (1st) 101911, ¶¶ 3-15. We reiterate only the facts necessary to understand the claims in Morales's postconviction petition.

¶ 6    At trial, Garcia and his wife, Sylvia Ortiz, testified that, in the early morning hours of December 23, 2007, they saw Morales, Daniel Roman, Martin Roman, Omar M., and Carlos Lopez congregate beneath their second-story apartment window. They watched as the group went across the street to the parking lot of a tortilla factory where the victim was driving a forklift.

¶ 7    Garcia and Ortiz saw several members of the group pull the victim off the forklift. All five of the assailants started to kick and punch the victim. During the attack, a sixth person, known to Garcia only as "Menace," arrived and joined the group. Eventually, they took the victim's billfold from his pocket.

¶ 8    Garcia testified that Martin Roman then went across the street and picked up a concrete rock and brought it back to the parking lot of the tortilla factory. He saw Martin Roman drop the rock on the victim the first time but could not tell who did it the second time "because there are three who have [a] similar slim build." On cross-examination, Garcia described a prior statement he had given to an assistant state's attorney, asserting that Carlos dropped the rock on the victim one time and Morales dropped it another time. He also explained his involvement

in Omar M.'s trial where he had testified that "[i]t was Carlos and another one [who hit the victim with the rock] which I can't identify because they were all skinny."

¶ 9 In November 2015, Morales filed this postconviction petition, claiming a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), for the State's failure to disclose an agreement with Garcia that the state's attorney's office would assist him in his immigration matters if he testified in the prosecutions against Morales and his codefendants. In support of his claim, Morales attached two documents: a letter from the state's attorney's office to the Immigration and Nationality Service (INS) and a transcribed voicemail from Garcia to the state's attorney's office.

¶ 10 The letter from the State to the INS reads, in its entirety:

> "Immigration and Nationality Service
>
> Re: Fernando Garcia
>
> To Whom It May Concern:
>
> I am writing to you in connection with Mr. Garcia's citizenship application.
>
> I have become acquainted with Mr. Garcia in connection with my prosecution of five men for First Degree Murder in a case entitled People of the State of Illinois vs. Ismael Morales, et al., No. 08 CR 3180 before the Honorable James Linn in the Circuit Court of Cook County. A sixth person, a juvenile offender was also charged in connection with the crime. I did not, however, handle the juvenile prosecution.
>
> Mr. Garcia was an eyewitness to the murder, which occurred outside his house on Christmas Eve, 2007. Mr. Garcia's cooperation with the Chicago Police Department and Cook County State's Attorney's Office personnel investigating the case was instrumental in the arrest and eventual charging of the offenders. Subsequently, Mr. Garcia testified in the jury trials of the juvenile offender, two of the adult offenders and in the bench trial of a third adult offender. All four were convicted of First Degree Murder. It is anticipated that Mr. Garcia will be called to testify at the trial of the remaining two adult offenders. It is our expectation that those offenders will go to trial by early 2011.
>
> Please feel free to contact me about Mr. Garcia or if I can be of any assistance to you."

The letter is signed by Assistant State's Attorney Andrew Varga and dated July 22, 2010.

¶ 11 The State had included the transcription of Garcia's voicemail in a January 31, 2011, supplemental answer to discovery in codefendants Martin Roman's and Adolfo Zuniga's cases. After brief prefatory language, it reads:

> "On January 31, 2011 at 8:20 am, via voicemail message of Patricia Gonzalez, Cook County State's Attorney's Victim Witness, the following message was left by Louis Fernando Garcia in Spanish: 'Look Patty Patty. I don't know if you're going to hear this message. But I've very mad. When is the … Supposedly it's Monday, the courtdate [*sic*], you know what? If you don't help me with immigration or disability I'm going to deny everything and I'm going to say that you forced me to say everything. I've already said—ok—it's that simple. If you want to arrest me you know where I live, I'll be waiting for you here. You are over there like the white dove and I'm over here putting up with s*** and everything and risking my life and you can't resolve something this easy. Ok. Bye. I'm sorry."

The transcription of the voicemail was provided by an official interpreter.

¶ 12 Morales's petition also raises a claim of actual innocence predicated on the affidavit of Victor Redding. His affidavit states that he was driving by the tortilla factory on December 23, 2007, when he saw "six young Latino males beating an older Latino male beside a forklift." Redding claimed that, as he drove by, he was able to see the faces of the assailants. In January of 2015, a jailhouse lawyer approached Redding about the case and "asked [him] to look at three or four Latinos" to see if they were the assailants. Redding averred that he was "sure that Mr. Ismael Morales was not involved in the murder/robbery." Redding's affidavit concludes by stating that he did not come forward sooner both because he was afraid of police retaliation and because he did not know Morales.

¶ 13 The circuit court summarily dismissed Morales's petition on November 15, 2015, finding the *Brady* claim frivolous because the jury "knew that these people were in the country illegally." As to the actual innocence claim, the court found the affidavit not "in any way compelling" and lacking credibility. Morales filed a notice of appeal. Due to some confusion about the pendency of the petition, the trial court entered an order summarily dismissing the petition again about a month later. Morales filed another notice of appeal. We granted Morales's motion to consolidate the appeals.

¶ 14                                         II. ANALYSIS

¶ 15 Morales contends that the letter to INS and Garcia's voicemail are evidence of an agreement for immigration assistance and that, because Morales's conviction hinged exclusively on eyewitness testimony, evidence of this deal would have been both favorable and material to his case. The State responds that the INS letter and the voicemail reveal no "deal" and that, regardless, the evidence against Morales was overwhelming. As a result, according to the State, even if a deal existed, it would not have been material to Morales's conviction.

¶ 16                         First-Stage Postconviction Proceedings

¶ 17 The Act provides a procedure to criminal defendants to raise constitutional claims about their trial or sentencing that were not and could not have been raised on direct appeal. *People v. Allen*, 2015 IL 113135, ¶ 20. Proceedings under the Act advance through three stages. *Id.* ¶ 21. At the first stage, the circuit court evaluates the petition to determine whether it is frivolous or patently without merit. If the petition passes that low bar, it is docketed for second-stage proceedings. *Id.* At the second stage, counsel can be retained or appointed, and the defendant must show that his or her petition makes a "substantial showing" of a constitutional violation. *Id.* The State also can participate for the first time at the second stage and either answer or move to dismiss. *Id.* If the petition survives the second stage, it advances to an evidentiary hearing where the circuit court receives evidence and determines whether the defendant is ultimately entitled to relief. *Id.* ¶ 22.

¶ 18 Since the circuit court dismissed Morales's petition at the first stage, we determine whether the petition is "frivolous or patently without merit," meaning it is based on " 'an indisputably meritless legal theory or a fanciful factual allegation.' " *Id.* ¶ 25 (quoting *People v. Hodges*, 234 Ill. 2d 1, 16 (2009)). Meritless legal theories are those "completely contradicted by the record," and fanciful factual allegations are those that are "fantastic or delusional." (Internal quotation marks omitted.) *Id.* In other words, the petition can only be dismissed at this stage if

it "has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 11-12. At the first stage, we take the allegations in the petition as true and construe them liberally in favor of the petitioner. *Allen*, 2015 IL 113135, ¶ 25. We review the first-stage dismissal of a postconviction petition *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 19                                    The *Brady* Claim

¶ 20    In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that due process requires the State to disclose "evidence favorable to the accused and material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73 (2008) (citing *People v. Harris*, 206 Ill. 2d 293, 311 (2002), and *Brady*, 373 U.S. at 87). When a defendant alleges a violation of due process based on a violation of *Brady*, he or she must show three things: (i) the allegedly withheld evidence was favorable as either exculpatory or impeachment evidence, (ii) the prosecutor either willfully or inadvertently suppressed evidence, and (iii) the evidence was material to guilt or punishment. *Id.* at 73.

¶ 21    Morales's postconviction petition alleges that the State violated *Brady* by failing to disclose evidence that it had offered Garcia, and by extension Ortiz, assistance in his immigration matters in exchange for their testimony at Morales's trial. Morales attached to his petition both the letter to INS and the letter containing the transcription of Garcia's voicemail, arguing that they are evidence of the agreement that existed between Garcia and the State. According to Morales, evidence of the agreement was favorable to him because it had impeachment value and was material to his conviction because the State's case hinged exclusively on Garcia's and Ortiz's eyewitness testimony.

¶ 22                                    Failure to Disclose

¶ 23    The parties dispute whether the prosecution arguably failed to disclose anything at all. The State argues that it actually kept neither the letter to the INS nor the transcription of Garcia's voicemail from the defense, both being tendered soon after they were made. The State also argues that it could not have failed to tender favorable information because neither the letter nor the transcription memorializes a "deal" for immigration assistance and thus neither contains favorable information to the defense. The State's argument as to both the letter and the voicemail misunderstands Morales's claim and the governing law.

¶ 24    As a factual matter, Morales is not claiming that the letter to INS or the voicemail left for the prosecutor *are* the agreements that the State failed to disclose; instead, he argues that the letter and voicemail are *evidence* of a preexisting agreement or understanding that the State failed to disclose. We agree. Taking the facts in the petition as true and construing them liberally in Morales's favor, as we must, we find the letter and voicemail at least *arguably* show the existence of an agreement to help Garcia in exchange for his trial testimony.

¶ 25    We find it at least arguable that Garcia would not have called the state's attorney's office out of the blue and demanded assistance with specific personal matters—immigration and disability—without having at least broached the possibility of assistance with the State earlier. Language in the voicemail—like "I've already said" and "you can't resolve something this easy"—make it sound as though there had been discussions that Garcia was following up on. Similarly, we find it at least arguable that the state's attorney's office would not write to INS about a witness without that witness's prompting. Both of these documents provide at least

some evidence that the State had engaged Garcia in discussions about favorable assistance in his immigration matters in exchange for his testimony.

¶ 26    We acknowledge the State's argument that the transcription of Garcia's voicemail is potentially susceptible to more than one reading. Specifically, the State argues that the voicemail should be interpreted to mean that Garcia told the truth at the previous trials and was threatening to recant that testimony and lie at the upcoming trials if the State did not help him. Of course, as we have just set out, that is not the only possible interpretation. At this stage, however, it is not for us to weigh the credibility of these two competing interpretations. *People v. Scott*, 2011 IL App (1st) 100122, ¶ 23 (at first stage, court "not permitted to engage in any fact-finding or credibility determinations" (citing *People v. Coleman*, 183 Ill. 2d 366, 385 (1998))). We construe the allegations liberally in Morales's favor, and doing so leads to the conclusion that there was arguably an agreement between the State and Garcia that he would receive immigration assistance if he testified favorably at all of the defendants' trials.

¶ 27    Because the State has taken a view of evidence not suited to the first stage of postconviction proceedings, it has, in turn, misapplied the law. The State's brief takes the position that no deal ever existed. But, as Morales points out, for the State's disclosure requirement to be triggered, there need not be any express agreement or deal. See *United States v. Bagley*, 473 U.S. 667, 683 (1985) ("The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen the incentive to testify falsely in order to secure a conviction."). The letter to the INS reads: "Mr. Garcia's cooperation with the Chicago Police Department and Cook County State's Attorney's Office personnel investigating the case was instrumental in the arrest and eventual charging of the offenders *** All four were convicted of First Degree Murder." This is arguably evidence of the type of unofficial promise raised in *Bagley*.

¶ 28    This part of the letter also responds to the focus of the State's oral argument—the lack of any evidence of exactly when the unofficial promise, if any, was made. The State's letter praises Garcia's involvement all the way back to the prearrest period of the Chicago Police Department's investigation and links Garcia's cooperation to Morales's case by name. At this early stage, where we must construe all well-pled facts in Morales's favor, it is at least arguable that cooperation in the form of an immigration agreement began before Morales's sentencing. We acknowledge that the State may be able to challenge these factual claims, perhaps successfully, at later stages of the postconviction proceedings and emphasize that our disposition is based heavily on the deferential standard of first-stage review.

¶ 29    Remaining mindful of the liberal construction we are to afford Morales's petition at this stage, we find sufficient evidence attached to his petition to conclude that the State *arguably* failed to disclose a pretrial agreement for immigration assistance in the event Garcia's testimony was helpful in securing the convictions of the offenders.

¶ 30                                    Favorability to Morales

¶ 31    Morales argues that the undisclosed evidence arguably favors him because any assistance related to Garcia's immigration status had impeachment value as to his credibility. The State's brief does not offer a response relating to the question of favorability, instead focusing on both the lack of existence of an agreement and the lack of materiality to Morales's conviction. Indeed, at oral argument, the State appeared to concede favorability by agreeing that it would

have had the obligation to disclose any immigration deal it had with Morales, if such a deal existed. We agree.

¶ 32    The Supreme Court has found that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" falls within the rule requiring prosecutors to disclose favorable evidence. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); see also *Bagley*, 473 U.S. at 676 ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule."). A defendant may impeach a State's witness with evidence of that witness's "biases, interests, or motives to testify." *People v. Triplett*, 108 Ill. 2d 463, 474 (1985). Impeachment evidence of that kind includes evidence that "any promises of leniency have been made or any expectations of special favor exist in the mind of the witness." (Internal quotation marks omitted.) *Id.* at 476. The Second District has held that a person, present in the United States illegally or whose legal status has lapsed, "might be vulnerable to pressure, real or imagined, from the authorities," even if there are no immigration proceedings currently pending. *People v. Austin*, 123 Ill. App. 3d 788, 797 (1984). This confluence of authority demonstrates that "expectations of special favor" from the State in the form of assistance in immigration matters at least arguably constitute a ground for impeachment.

¶ 33    Because we have found that Morales's petition arguably shows that the State and Garcia had engaged in pretrial discussions about assistance with Garcia's immigration matters, we also agree that the disclosure of those discussions would arguably have been favorable to Morales.

¶ 34                                    Materiality

¶ 35    Morales argues that impeachment with information about favorable immigration assistance to Garcia was material because the evidence against him came exclusively from Garcia's and Ortiz's eyewitness testimony. He points out that there was no physical evidence against him, and unlike his codefendant Daniel Roman, he did not confess to participating in the crime. The State disagrees, characterizing the evidence against Morales as "overwhelming." The State argues that the two eyewitnesses knew Morales and "unequivocally" identified him as an assailant. We agree with Morales that, construing his petition liberally, it is at least arguable that evidence of an agreement for immigration assistance between Garcia and the State would have been material.

¶ 36    The standard for materiality resembles the familiar prejudice standard that we apply in ineffective assistance of counsel cases. See *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The question is "not whether the defendant would more likely than not have received a different verdict with the [withheld] evidence, but whether in its absence he received a fair trial." *Id.*; see also *Beaman*, 229 Ill. 2d at 74. This presents a low bar. In the analogous *Strickland* context, we have found the standard to mean the chance of acquittal "is 'significantly less than 50 percent,' as long as a verdict of not guilty would be reasonable." (Internal quotation marks omitted.) *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45 (quoting *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008)). Of course, we must remember that we are talking about a first-stage postconviction petition, so it must only be *arguable* that there is a significantly less than 50% chance of acquittal had the prosecutor provided the withheld information. Morales need not show that the evidence would have been insufficient to convict him had the prosecutor disclosed the missing evidence;

instead, he only must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

¶ 37    We accept that Garcia's and Ortiz's testimony was sufficient to sustain Morales's conviction, and our assessment of the strength of the evidence should only be read in light of the low first-stage postconviction standard of review. We have already found that "the State's case turned on the reliability of the identifications of the defendant by the eyewitnesses." *Morales*, 2012 IL App (1st) 101911, ¶ 44. That said, we believe the information Morales identifies, potentially bearing on Garcia's credibility, is material as his truthfulness and memory were "critical" to the State's case.

¶ 38    At various points in his brief, Morales implies, but never directly argues, that our analysis should apply equally to Ortiz. We disagree. The letter from the state's attorney's office to the INS refers only to Garcia, and Garcia's voicemail refers only to himself in the first person singular. While we conclude that this evidence presents an arguable claim that the State withheld information about some kind of deal between it and Garcia, we cannot say the same about Ortiz. The petition does not plead any facts about her immigration status specifically, let alone that she needed any help with it. While we must liberally construe the facts pled, we can draw no inference from facts that do not appear in the petition's allegations or supporting evidence. See *People v. Delton*, 227 Ill. 2d 247, 254 (2008) ("a 'limited amount of detail' does not mean that a *pro se* petitioner is excused from providing any factual detail at all"). Regardless, our rejection of any argument extending the *Brady* analysis to Ortiz does not change the outcome.

¶ 39                                  *People v. Roman*
¶ 40    The parties dispute the applicability of our earlier decision in the first-stage postconviction appeal of one of Morales's codefendants, Daniel Roman. See *Roman*, 2016 IL App (1st) 141740. Roman raised a substantially similar *Brady* claim in his postconviction petition, which the court also dismissed at the first stage. *Id.* ¶ 1. The parties' dispute about the value of our decision in *Roman* is understandable. Our express holding in *Roman* was that the circuit court correctly dismissed his postconviction petition at the first stage because the letter and email "were not material to Roman's guilt or his punishment." *Id.* ¶ 24. There, as here, the State conceded the favorability of the evidence, assuming it showed an agreement. *Id.* ¶ 19.

¶ 41    While our analysis in *Roman* appears to blend the question of favorability with the question of materiality, to the extent our decision in *Roman* can be read to find that the undisclosed information was not material, we believe we were correct but agree with Morales that his case differs.

¶ 42    Two aspects of the proof against Daniel Roman distinguish his case from Morales's case. First, evidence in Roman's case indicated that he had confessed to beating the victim. *Roman*, 2013 IL App (1st) 102853, ¶ 14. Morales did not confess. Second, Garcia's and Ortiz's testimony directly implicated Roman in the prior crimes evidence concerning the December 4 incident. By contrast, Morales was not directly implicated in the December 4 incident. The confession corroborates evidence of Roman's involvement that is not dependent on the credibility of Garcia or Ortiz. Accordingly, we agree with Morales that our decision in *Roman* does not control our disposition of his claim.

- 8 -

¶ 43    We conclude that Morales has made an arguable claim that the State violated *Brady* by failing to disclose the existence of an agreement with Garcia about immigration assistance in exchange for his testimony. Because the Act does not permit partial summary dismissals, our resolution of Morales's *Brady* claim resolves this appeal, and we need not address his actual innocence claim. See *People v. Cathey*, 2012 IL 111746, ¶ 34.

¶ 44    We reverse the first-stage dismissal of Morales's postconviction petition and remand for second-stage proceedings consistent with the Act.

¶ 45    Reversed and remanded.