2021 IL App (1st) 180699-U

No. 1-18-0699

Order filed June 23, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) | No. 07 CR 3703 |
| | ) | |
| ANTOINE SIMMONS, | ) ) | Honorable Thomas Joseph Hennelly, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse concurred in the judgment.
Justice Burke dissented.

**ORDER**

¶ 1   *Held*:   Reversed and remanded. Postconviction petition stated gist of claim for ineffective assistance of counsel.

¶ 2   Defendant Antoine Simmons appeals from the circuit court's first-stage dismissal of his *pro se* petition for relief filed under the Post-Conviction Hearing Act. On appeal, defendant contends that this court should remand for further postconviction proceedings because he raised an arguable claim that he was denied the effective assistance of trial counsel, in that his trial counsel failed to investigate or contact two alibi witnesses he provided counsel. We agree that

the petition stated the gist of an ineffectiveness claim. We reverse and remand for second-stage proceedings.

¶ 3                                BACKGROUND

¶ 4      In 2012, a jury convicted defendant of multiple counts of first-degree murder. Defendant was sentenced to 100 years for murder and life in prison because he personally discharged a firearm that caused death. On direct appeal, we affirmed defendant's conviction and sentence, vacated three of his murder convictions under the one-act, one-crime doctrine, and directed the clerk of the circuit court to issue a corrected mittimus reflecting only one count of first-degree murder. *People v. Simmons*, 2016 IL App (1st) 131300.

¶ 5      Because we set forth the evidence presented at trial in detail on direct appeal, we recount only those facts required for the disposition of the current appeal. At trial, Karl Stevens testified that on December 27, 2006, he was with Larry Watkins. Stevens smoked two "blunts" of marijuana in the morning. That evening, Watkins and Stevens drove in Watkins's black '97 Monte Carlo and encountered Jeffon Henson at a liquor store on 50th Street and May Street. The trio left the liquor store together in Watkins' car. Watkins was driving, Stevens was sitting in the front passenger seat, and Henson was sitting in the middle of the back seat. They picked up marijuana from Watkins' house and drove to Washington Park.

¶ 6      While waiting at a stoplight on Garfield Boulevard, Stevens saw a red car with two occupants, a woman sitting in the passenger seat, and a man Stevens identified in court as defendant sitting in the driver's seat. Watkins drove in the same direction as the red car. When Watkins and defendant stopped their respective cars at a stoplight at the intersection of Michigan Avenue and Garfield Boulevard, Watkins bumped Stevens to get his attention. Stevens then

looked to his left and saw defendant sitting in his car holding an object in his hand that was pointed in Watkins's and Stevens's direction. Stevens then saw a flash. Stevens grabbed the steering wheel, pulled it to the right, and Watkins' car crashed. Stevens then went to a nearby McDonald's restaurant to ask for help. Stevens testified that he did not know defendant prior to the day of the shooting. On January 11, 2007, Stevens met with police and identified defendant in a physical lineup.

¶ 7     On cross-examination, Stevens testified that he did not hear Watkins or Henson say anything to defendant. By the time they reached Garfield Boulevard and State Street, Stevens was not paying attention to defendant and the red car. Stevens did not notice anything at the stoplight at Michigan until Watkins bumped him. Stevens turned the music down and then looked back at Watkins and saw a flash. Stevens ducked and grabbed the steering wheel.

¶ 8     On redirect, Stevens testified that, after the lineup on January 11, 2007, he saw defendant in a police car.

¶ 9     Henson testified that, on the day of the shooting, he saw Watkins and Stevens at a liquor store on 51st Street and May Street. Henson left with Watkins and Stevens, and they went to Watkins' house for 15 minutes, after which they drove on Garfield Boulevard towards Lake Michigan. At the intersection of Garfield Boulevard and Wells Street, a maroon Grand Prix pulled out of a gas station and blocked Watkins' car. Henson testified that the Grand Prix cut off Watkins and was "just driving crazy, *** swerving all over the road." Henson continued watching the Grand Prix as they drove on Garfield Boulevard. Henson testified that he could see inside the Grand Prix, and in court he identified defendant as the person who was driving the car.

¶ 10     Henson testified that eventually, he saw defendant say something. The woman in the passenger seat leaned back, and the front passenger window lowered. At that point, Henson got Watkins's attention, and Watkins turned towards the passenger side of defendant's car. Henson then saw "the hand, something go, and [he] heard pow." Henson ducked, though he did not see a gun. When he sat up, Henson saw that Watkins was slumped over. Stevens grabbed the steering wheels, and the car swerved and crashed into several cars.

¶ 11     On January 11, 2007, Henson went to the police station and identified defendant from a physical lineup.

¶ 12     Michael Smith testified that on December 27, 2006 at around 8:45 P.M., he was driving with a friend when a maroon Grand Prix pulled in front of him. the date in question, just after 8:45 pm., he was driving with a friend. Smith testified that the Grand Prix drew his attention because it had nice wheels. Smith testified that he could see the car "very, very well," and he identified defendant as the person driving the car. He further stated that there was a woman sitting in the front passenger seat. Smith testified that defendant cut him off and then sped away.

¶ 13     After traveling for a few blocks, Smith caught up to defendant. Smith saw defendant's car next to a black Monte Carlo driven by Watkins. Smith testified that defendant's and Watkins's cars were driving slowly and that other cars were maneuvering around them. Smith observed that defendant's passenger window was down. Smith testified that as he passed defendant's and Watkins's cars, he heard a single pop sound. Smith slowed down, and then saw Watkins's car hit a parked car. Defendant's car then sped off.

¶ 14     After Smith dropped off his friend, he returned the way he had come and saw police officers where he had seen defendant's and Watkins's cars. Smith stopped and spoke to the

police. On January 4, 2007, Smith spoke to the police again and identified defendant from a photo lineup. On January 11, 2007, Smith identified defendant from a physical lineup.

¶ 15    Detective Brian Lutzow testified that he investigated the case and received a description of a car involved in the shooting. The car was recovered and Lutzow showed Stevens, Henson, and Smith a photo of it, each of whom identified it as the car involved in the shooting. Lutzow learned the name of a person associated with the car, compiled a photo array, and showed the array to Smith, who identified defendant.

¶ 16    Ellen Williams testified that she knew defendant. She recounted an incident that occurred on November 14, 2006, in which she had an argument with defendant that culminated with defendant shooting her.

¶ 17    Brian Mayland, a forensic scientist with the Illinois State Police, testified that he compared the bullet recovered from Watkins's body with the bullet recovered from Williams's jacket, and found the class characteristics were the same. According to Mayland, further analysis revealed that the bullets recovered from Watkins's body and Williams's jacket were fired from the same gun.

¶ 18    The jury found defendant guilty of first-degree murder and personally discharging a firearm that proximately caused death to another person. Prior to filing a motion for new trial, defendant asked to discharge his attorney because "it was too much and too much did in the trial and stuff wasn't even brought up like the car I was arrested in or anything." Defendant hired private counsel, who filed a motion for new trial, which was denied. The court sentenced defendant to 100 years' incarceration for first degree murder and natural life imprisonment for the sentencing enhancement related to defendant's use of a firearm.

¶ 19    On direct appeal, defendant argued that: (1) the State's evidence was insufficient, (2) the court erred by denying a motion to suppress, (3) expert testimony introduced by the State was inadmissible because it lacked foundation, (4) evidence regarding Williams's shooting was inadmissible, (5) the prosecution made improper and prejudicial comments during closing arguments, and (6) three of his murder convictions should be vacated pursuant to the one-act, one-crime doctrine. We affirmed defendant's conviction and sentence but vacated three murder convictions under the one-act, one-crime rule and directed the clerk to issue a corrected mittimus accordingly. *People v. Simmons*, 2016 IL App (1st) 131300, ¶¶ 2-4.

¶ 20    On December 29, 2017, defendant filed a *pro se* petition for postconviction relief under the Act. In the petition, defendant alleged, among other things, that his trial counsel was ineffective for refusing to call as witnesses his girlfriend, Tanisha Alexander, and a woman named Audrey Ward. According to defendant, if called, both women would have testified that when Watkins was killed, defendant was at his home in Lombard, Illinois with Alexander. According to defendant, his trial attorney told him that if Alexander or Ward had criminal records, the jury would likely discredit their testimony. In addition, counsel warned defendant that if he tried to establish an alibi, the State would bring more witnesses to testify against him.

¶ 21    Defendant's petition did not contain affidavits from Alexander or Ward. Defendant explained that he

> "tried to obtain affidavits from my witnesses but have been unable to do so because I constantly been move [*sic*] from Illinois to out-of-state facility and the State is making it harder for me to contact anyone now because they have transfer [*sic*] me from Pontiac C.C. to New Jersey State Prison, then to ADC of Arkansas DOC Tucker Maximum

Security Unit then to ADC Arkansas DOC Varner Supermax and now to Arizona Department of Corrections ADC where it's a enhanced unit and prisoner [*sic*] are not allowed law library with they don't provide legal material for incompact transfer inmate or case laws period for out-of-state inmate which they say I must received [*sic*] them from the court and I am incarcerated and indigent, and unable to stay in contact with my witnesses current address without assistance from the court."

¶ 22    On February 16, 2018, the circuit court summarily dismissed defendant's petition. The court explained, "I have reviewed [defendant's] petition. There's no contrary evidence to what he alleges. No newly discoverable evidence. Everything that he has in his petition is refuted by the record. I find that his petition is frivolous and patently without merit." This appeal followed.

¶ 23                                    ANALYSIS

¶ 24    On appeal, defendant claim his *pro se* postconviction petition should not have been dismissed at the first stage, as it set forth an arguable claim that his trial counsel was ineffective for failing to investigate and call Alexander and Ward as alibi witnesses. He argues that he was not required to attach affidavits from the alibi, as he sufficiently explained his failure to do so, and that contrary to the circuit court's ruling, this new information was not refuted by the record. Our review of a first-stage dismissal is *de novo*. *People v. Allen*, 2015 IL 113135, ¶ 19.

¶ 25    The Act permits a defendant to challenge his conviction on constitutional grounds. 725 ILCS 5/122-1(a) (West 2014); *People v. English*, 2013 IL 112890, ¶ 21. The Act establishes a three-stage adjudication process. *English*, 2013 IL 112890, ¶ 23. A case may be dismissed at the first stage only if it is "frivolous" or "patently without merit." 725 ILCS 5/122-2.1 (West 2014);

*People v. Harris*, 224 Ill. 2d 115, 125-26 (2007). "[T]he threshold for a petition to survive the first stage of review is low." *People v. Allen*, 2015 IL 113135, ¶ 24.

¶ 26                                    I. The Lack of Evidentiary Affidavits

¶ 27    We begin with the State's argument that the ineffectiveness claim should be rejected at the outset for failure to attach evidentiary affidavits.

¶ 28    The Act requires that a postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2016). "The purpose of the 'affidavits, records, or other evidence' requirement is to establish that a petition's allegations are capable of objective or independent corroboration." *People v. Hodges*, 234 Ill. 2d 1, 10 (2009) (citing *Delton*, 227 Ill. 2d at 254). Thus, the supporting material must (1) show "the petition's allegations are capable of corroboration" and (2) identify "the sources, character, and availability of evidence alleged to support the petition's allegations." *Allen*, 2015 IL 113135, ¶ 34.

¶ 29    And though the threshold for satisfying first-stage review is low, "[t]his low threshold does not excuse the *pro se* [defendant] from providing factual support for his claims; he must supply sufficient factual basis to show the allegations in the petition are capable of objective or independent corroboration." *Allen*, 2015 IL 113135, ¶ 24; accord *People v. Harris*, 2019 IL App (4th) 170261, ¶ 11. A defendant's failure to attach the affidavits or documentation required by section 122-2, or otherwise explain their absence, is "fatal" to his postconviction petition and will independently justify the summary dismissal of that petition at the first stage. *People v. Delton*, 227 Ill. 2d 247, 255 (2008); *People v. Collins*, 202 Ill. 2d 59, 66 (2002).

¶ 30    Here, obviously, defendant did not attach evidentiary affidavits to his claim. We can say this much at the outset: His failure to attach an affidavit from his trial counsel, at whom he directs his claim of ineffective assistance, is not fatal to his claim. The "failure to attach independent corroborating documentation or explain its absence may, nonetheless, be excused where the petition contains facts sufficient to infer that the only affidavit the defendant could have furnished, other than his own sworn statement, was that of his attorney." *People v. Hall*, 217 Ill. 2d 324, 333 (2005); see also *People v. Ramirez*, 402 Ill. App. 3d 638, 641-42 (2010) (noting that difficulty in obtaining affidavit from counsel regarding her own ineffectiveness is "self-apparent"); *People v. Harris*, 2019 IL App (4th) 170261, ¶ 19 (noting exception to affidavit requirement "where a defendant's claim is based on consultations with his or her attorney, as it can be reasonably inferred the only supporting material a defendant could provide, other than a personal evidentiary affidavit, is an evidentiary affidavit of the attorney, the difficulty of which is self-apparent.").

¶ 31    But that leaves the affidavits of the two supposed alibi witnesses, Alexander and Ward. It is undisputed, of course, that the petition contains no such affidavits. The question, then, is whether the petition explained their absence. See *Delton*, 227 Ill. 2d at 255; *Collins*, 202 Ill. 2d at 66; 725 ILCS 5/122-2 (West 2016) ("The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or *shall state why the same are not attached*." (Emphasis added.)).

¶ 32    The Act does not specify what explanation is sufficient. The parties cite no case law on this point, and we are aware of none. In other words, the Act provides that the petition "shall

state why" (*id*.) supporting documentation is absent but provides no standard by which we should judge that statement.

¶ 33     Perhaps there is none, but even if a standard of sufficiency existed, defendant's explanation would have satisfied any such standard. Defendant explained that he was continually moved about the country from prison to prison as part of an interstate compact—from Pontiac, Illinois to New Jersey to Arkansas to a second prison in Arkansas and finally to Arizona. (See *infra* ¶ 20.) And while the record on appeal does not disclose the various prisons to which he was transferred, we do note that defendant's petition was filed from his prison in Arizona. Defendant noted that he was running up against a deadline to file his postconviction petition, following the Illinois Supreme Court's denial of his petition for leave to appeal on his direct appeal, and with a tight deadline and being moved about the country, it was difficult to stay in touch with potential witnesses and thus secure the affidavits. He further claimed that he was denied access to a law library and legal materials, prison officials took away many of his court documents, and he was assigned at the time of the petition's filing to an "enhanced unit" within Arizona's correctional system. Finally, defendant pointed to the fact that he was indigent and incarcerated.

¶ 34     The State argues, in response, that only incarcerated individuals file postconviction petitions, and many of them are indigent, so if that were enough to forgo the affidavit requirement, we would effectively write the affidavit requirement out of existence. As far as that goes, the State is correct. See *Harris*, 2019 IL App (4th) 170261, ¶ 19 ("Because the Act contemplates defendants seeking postconviction relief are likely to be imprisoned, we hold imprisonment, by itself, cannot excuse a defendant's failure to attach supporting material to a postconviction petition.").

¶ 35    The State further argues that defendant did not need a law library or other legal materials to draft and affidavit for these witnesses. That is probably a fair point as well. Indeed, defendant managed to file his postconviction petition without such resources.

¶ 36    But that is as far as we can agree with the State. Defendant's principal point is his difficulty in communicating with these witnesses. He purports to know that one of the witnesses, Alexander, still resides at her home in Lombard (where he claims he was at the time of the murder), and he purports to know that Ward is currently living in Virginia. But even if he knew those things, it does not follow that his communication with these individuals would be so simple, particularly if he were shuttled around from institution to institution, from state to state. If, for example, he were corresponding by U.S. mail with these individuals, he might have written a letter to one of them from a prison in Arkansas, only to be in Arizona by the time a reply arrived.

¶ 37    We cannot imagine the difficulties a prisoner in this situation might have had. And the State is correct that defendant does not go into great specifics on this point. He does not provide a blow-by-blow account of his attempts at communication with these witnesses. Nor does he provide the timing of each of his many interstate transfers. Should we summarily dismiss his petition because he did not provide that level of specificity?

¶ 38    In our view, it would be a miscarriage of justice to place such high demands on a *pro se* petitioner at this early juncture. Illinois courts have repeatedly noted the difficulty *pro se* prisoners face in drafting postconviction petitions, which is why the threshold for survival at the first stage (compared to the second stage, where counsel enters the picture) is low. See *Allen*, 2015 IL 113135, ¶ 24; *Hodges*, 234 Ill. 2d at 9.

¶ 39 The explanation that defendant has given is more than sufficient, under any standard, to justify the failure to attach supporting evidentiary affidavits at the first stage—and we are speaking here only of the first stage. See *People v. Spivey*, 2017 IL App (2d) 140941, ¶ 16 (noting that generally, "if a defendant seeking postconviction relief explains why no affidavit or other evidentiary material is attached to the petition, the omission is not a ground for dismissal," and contrasting first-stage proceedings with those at second stage, where such defect is not forgiven); *Allen*, 2015 IL 113135, ¶¶ 34-35 (failure to notarize affidavit not grounds for summary dismissal, but "the State may challenge this nonjurisdictional procedural defect at the second stage of proceedings."). We thus proceed to the merits of the underlying claim.

¶ 40                              II. The Merits of the Ineffectiveness Claim

¶ 41 The law at the first stage is long settled. We take the allegations in the petition as true and draw all reasonable inferences in favor of advancing the petition. *People v. Morales*, 2019 IL App (1st) 160225, ¶ 18. A petition should be dismissed only if it " 'frivolous or patently without merit, meaning it is based on ' "an indisputably meritless legal theory or a fanciful factual allegation." ' " *Id.* (quoting *Allen*, 2015 IL 113135, ¶ 25, quoting *Hodges*, 234 Ill. 2d at 16). "In other words, the petition can only be dismissed at this stage if it " 'has no arguable basis either in law or in fact.' " *Id.* (quoting *Hodges*, 234 Ill. 2d at 11-12).

¶ 42 A postconviction claim of ineffective assistance of counsel is governed by the principles established in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Brown*, 2017 IL 121681, ¶ 25. A defendant must establish that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by counsel's deficient performance. *Id.* As with other first-stage petitions, however, one claiming ineffective assistance is judged by the

lower, "more lenient" first-stage pleading standard. *People v. Tate*, 2012 IL 112214, ¶ 19. That is to say, as our supreme court emphasized in *Tate*, the question at the first stage is not whether the petition demonstrates that the two *Strickland* prongs are satisfied, but whether " '(i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced.' " (Emphasis in original.) *Id.* ¶ 19 (quoting *Hodges*, 234 Ill. 2d at 17).

¶ 43                              A. Arguably Deficient Performance

¶ 44     Here, the petition alleges that defendant told his trial lawyer that he was with his girlfriend, Tanisha Alexander, and another woman named Audrey Ward, at Tanisha's home in Lombard, Illinois on the night of the murder, and that these women "were willing to testify about my whereabouts on the night of this murder." The petition alleges that his lawyer told him that if these witnesses "have any type of record it will be [unsuccessful] and a jury wouldn't believe it and if I call upon my witness[es] *** the state will come up with more witness[es] to testify against me." The petition alleges that, "[b]ecause these witnesses would have testified that I was with them at the time of the offense in this case, my attorney was ineffective for failing to interview them and call them to testify at my trial."

¶ 45     The State claims the petition reveals reasonable, sound trial strategy for counsel's decision not to contact these witnesses, and strategic decisions are generally immune from a *Strickland* claim. See *People v. Custer*, 2019 IL 123339, ¶ 39. But our supreme court has given clear signals that a discussion of trial strategy is "inappropriate for the first stage" of postconviction proceedings. *People v. Tate*, 2012 IL 112214, ¶ 22. It is, instead, "more

appropriate to the second stage *** where the petitioner's burden is to make a substantial showing of a constitutional violation." *Id.*

¶ 46    The State claims that we should not take that language in *Tate* as binding direction and suggests that courts have continued to consider the trial-strategy argument at the first stage. But we have, in fact, followed that holding in *Tate*. See, *e.g.*, *People v. Burns*, 2015 IL App (1st) 121928, ¶ 31 (reiterating that " '[t]he State's strategy argument is inappropriate for the first stage, where the test is whether it is arguable that counsel's performance bell below an objective standard of reasonableness and whether it is arguable that the defendant was prejudiced.' " (quoting *Tate*, 2012 IL 112214, ¶ 22)). We can think of no reason why this holding in *Tate* would not bind us—certainly not because another appellate decision may or may not have followed it.

¶ 47    In any event, a consideration of trial strategy would not persuade us, at this early juncture, to reject as frivolous and patently without merit the allegation that defendant's trial counsel performed deficiently here. "Trial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *People v. Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland*, 466 U.S. at 691). And when " ' "counsel had reason to know, from an objective standpoint, that a possible defense *** was available, failure to investigate fully can constitute ineffective assistance of counsel." ' " *Id.* (quoting *Brown v. Sternes,* 304 F.3d 677, 692 (7th Cir. 2002), quoting *Jones v. Page,* 76 F.3d 831 (7th Cir.1996)).

¶ 48    "In particular, 'the failure to interview witnesses may indicate incompetence when trial counsel knows of the witness and their testimony may be exonerating.' " *People v. Clark*, 2011

IL App (2d) 100188, ¶ 26 (quoting *People v. Bell*, 152 Ill. App. 3d 1007, 1012 (1987)); see

*People v. Morris*, 335 Ill. App. 3d 70, 79 (2002) ("Defense counsel has a professional obligation,

both legal and ethical, to explore and investigate a client's alibi defense. *** Failure to conduct

investigation and develop a defense has been found to be ineffective assistance."); *People v.*

*Makiel*, 358 Ill. App. 3d 102, 107 (2005) ("An attorney who fails to conduct reasonable

investigation, fails to interview witnesses, and fails to subpoena witnesses cannot be found to

have made decisions based on valid trial strategy.").

¶ 49    We repeat that these are only allegations at this stage; we make no finding as to whether

defendant's counsel was, in fact, ineffective. But we take these allegations as true for now. And

they demonstrate a meritorious, potentially exonerating alibi defense that defendant's trial

counsel dismissed out of hand, failing to investigate in even cursory fashion by contacting the

alibi witnesses, Alexander and Ward. That is more than enough to allege the "gist" of a claim of

arguably deficient performance at the first stage.

¶ 50                                B. Arguable Prejudice

¶ 51    So we turn to the second prong, prejudice—that is, whether it is arguable that counsel's

alleged deficient performance could have led to a different outcome at trial. We acknowledge

again, as the State emphasizes, that we do not have the affidavits of Alexander and Ward, the

alibi witnesses, which we typically require in gauging the sufficiency of their would-be

testimony compared to the trial testimony. See, *e.g.*, *People v. Barcik*, 365 Ill. App. 3d 183, 190

(2006). But we have already held that defendant has sufficiently explained the absence of those

affidavits. It would be odd, as well as unfair in the extreme, to hold that defendant is excused

from the evidentiary-affidavit requirement of section 122-2 but that his underlying *Strickland*

claim is foreclosed at the first stage because … he isn't excused from the evidentiary-affidavit requirement.

¶ 52    And it's not as if defendant utterly lacks personal knowledge of those (alleged) facts. He swore in his petition that he was at Alexander's home in Lombard, with Ward as well, at the time of the murder. Taking that claim as true, as we must, it is not hard to imagine that Alexander and Ward would (allegedly) corroborate this information under oath as well—perhaps with more detail, perhaps less, but the sum and substance of their (alleged) affidavit testimony is not a mystery.

¶ 53    The State points to the eyewitness testimony at trial that placed defendant at the scene of the crime, which obviously would have contradicted any purported alibi testimony. But that conclusion invites a credibility determination we may not make at the first (or even second) stage of proceedings, that we reserve instead for the evidentiary third stage of proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 42; *People v. Coleman*, 183 Ill. 2d 366, 390-91 (1998). The fact that these alibi witnesses' testimony would conflict with the eyewitness testimony at trial, far from a reason to reject the claim now, is instead a reason why they arguably could have a made a difference in the outcome of the trial and should be considered further.

¶ 54                           CONCLUSION

¶ 55    Because the petition arguably demonstrates deficient performance and arguably demonstrates prejudice, the petition should advance to the second stage of proceedings.

¶ 56    The judgment of the circuit court is reversed. The case is remanded for second-stage proceedings.

¶ 57    Reversed and remanded.

¶ 58    JUSTICE BURKE, dissenting.

¶ 59    I write separately because I respectfully disagree with the majority's conclusion that defendant complied with the Act's requirement to explain why he failed to attach evidentiary affidavits from his purported alibi witnesses, Alexander and Ward.

¶ 60    As noted by the majority, the law of first-stage proceedings under the Act is well established. And indeed, at the first stage, a postconviction petition may only be dismissed if it is "frivolous" or "patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). In accordance with this statutory standard, our supreme court has remarked that "the threshold for a petition to survive the first stage of review is low." *People v. Allen*, 2015 IL 113135, ¶ 24. To proceed to second-stage proceedings, the defendant's petition needs only to present the "gist" of a constitutional claim. Id. This standard exists because most postconviction petitions are drafted by pro se petitioners with little legal knowledge. Id. The relaxed standard allows a potentially meritorious petition to advance to the second stage, where an indigent defendant is entitled to the appointment of postconviction counsel (725 ILCS 5/122-4 (West 2016), who then can help the defendant present his petition with formal legal arguments and citations to authority. See *Allen*, 2015 IL 113135, ¶ 24.

¶ 61    Despite the lenience afforded to a defendant at the first stage of the Act, he nevertheless must satisfy certain requirements in order for his petition to advance to the second stage. One such requirement is that he attach to his petition "affidavits, records, or other evidence supporting [his] allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2016). Doing neither, however, justifies the summary dismissal of the petition. *People v. Delton*, 227 Ill. 2d 247, 255 (2008). The purpose of requiring supporting material is to demonstrate "that a petition's

allegations are capable of objective or independent corroboration." *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). Critical is the word " 'independent,' " especially when the defendant raises a claim of ineffective assistance of counsel for failing to call an alibi witness because "common sense dictates that a defendant's own affidavit is not at all objective or independent." *People v. Teran*, 376 Ill. App. 3d 1, 4 (2007). Our supreme court has emphasized that, when a defendant raises a claim of ineffective assistance of counsel for failing to call an alibi witness, the petition "must be supported by an affidavit from the proposed witness." *People v. Enis*, 194 Ill. 2d 361, 380 (2000). "In the absence of such an affidavit, a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant, and further review of the claim is unnecessary." Id.

¶ 62    In the present case, as discussed by the majority, defendant obviously failed to include affidavits from Alexander and Ward, his purported alibi witnesses. Although he failed to attach to his petition affidavits supporting his allegations, he can nevertheless comply with the Act if he "state[s] why the same are not attached." 725 ILCS 5/122-2 (West 2016). As the majority points out, the Act does not specify what explanation from the defendant is sufficient, and there is no case law directly on point. However, long ago, our supreme court stated that a defendant must attach evidentiary affidavits or other supporting material, or "adequately explain their absence" in order to preclude summary dismissal. (Emphasis added.) *People v. Smith*, 40 Ill. 2d 562, 564 (1968). Three years later, our supreme court remarked that a defendant's failure to attach evidentiary affidavits or other supporting material must be "sufficiently explained." (Emphasis added.) *People v. Curtis*, 48 Ill. 2d 25, 27-28 (1971); see also *People v. Titone*, 151 Ill. 2d 19, 24-25 (1992) (quoting the " 'sufficiently explained' " language from Curtis). Although these qualifiers do not

provide an exact standard by which to measure a defendant's explanation, this language from our supreme court does demonstrate, to me, that the Act requires at least something more than a conclusory explanation.

¶ 63    In defendant's petition, he explained why the affidavits from Alexander and Ward were absent from his petition by stating he:

¶ 64    "tried to obtain affidavits from my witnesses but have been unable to do so because I constantly been move [sic] from Illinois to out-of-state facility and the State is making it harder for me to contact anyone now because they have transfer [sic] me from Pontiac C.C. to New Jersey State Prison, then to ADC of Arkansas DOC Tucker Maximum Security Unit then to ADC Arkansas DOC Varner Supermax and now to Arizona Department of Corrections ADC where it's a enhanced unit and prisoner [sic] are not allowed law library with they don't provide legal material for incompact transfer inmate or case laws period for out-of-state inmate which they say I must received [sic] them from the court and I am incarcerated and indigent, and unable to stay in contact with my witnesses current address without assistance from the court."

¶ 65    Concerning defendant's claims that he was unable to use the "law library" or obtain "legal material" and "case laws," as the State highlights, none of these privileges were necessary to obtain a witness affidavit. The majority concedes this point and observes that, despite defendant's lack of access, he still was able to file the instant postconviction petition. Beyond his inability to access the law library and legal material, defendant otherwise justified his failure to obtain the affidavits from Alexander and Ward essentially by the mere fact that he was imprisoned in multiple different locations and indigent. I do not believe, under the facts of this case, that the mere fact he was imprisoned in multiple different locations and indigent were an adequate (see Smith, 40 Ill. 2d at

564) or sufficient justification. See *Titone*, 151 Ill. 2d at 24-25; Curtis, 48 Ill. 2d 25 at 27-28. I believe defendant was required to do more than make conclusory assertions that his imprisonment in multiple different locations and indigence prevented him from obtaining and attaching these critical evidentiary affidavits.

¶ 66    Instructive is *People v. Harris*, 2019 IL App (4th) 170261, ¶ 5, where a pro se defendant filed a postconviction petition that included a claim of ineffective assistance of counsel for failing to request a continuance on the last of day of trial to secure testimony from two witnesses who would have bolstered his self-defense claim. To support that claim, the defendant attached unsigned affidavits drafted by him for those two witnesses and explained the absence of their signatures by stating they "were 'willing to sign their affidavits, but due to the harsh conditions of confinement, I have been unable to secure them.' " Id. The circuit court summarily dismissed the defendant's petition based, in part, on his failure to attach the required supporting material or explain why they were not attached. Id. ¶ 6.

¶ 67    On appeal, this court addressed the defendant's explanation for not having signed affidavits from his two self-defense witnesses. Id. ¶ 15. Initially, this court concluded that "imprisonment, by itself, cannot excuse a defendant's failure to attach supporting material to a postconviction petition." Id. ¶ 19. After making this conclusion, this court also observed that "defendant has not described any efforts he made to obtain the signatures of his ex-wife and daughter for the proposed affidavits he drafted for them, nor has he described any circumstances, other than his imprisonment, that may have prevented him from obtaining those signatures." Id. ¶ 20. This court then held that, because the defendant "failed to attach the necessary supporting material or provide

a reasonable explanation for its absence," the circuit court's summary dismissal of his postconviction petition was proper. Id.

¶ 68    In the present case, like the defendant in Harris, defendant merely explained that he "tried to obtain affidavits from my witnesses but have been unable to do so" without describing any specific efforts he undertook to obtain the affidavits of Alexander and Ward, such as any details about his attempts to communicate with them, despite knowing where both of them lived. Based on defendant's vague explanation, we have no way of ascertaining whether defendant has contacted Alexander or Ward, whether they even have agreed to provide affidavits for him, and what, if anything, they would say about his presence on the night of the murder. Unlike Harris, however, according to defendant's affidavit, he was not just imprisoned in one location but rather shuttled around from institution to institution and from state to state. And this shuttling around was what prevented him from being able to obtain the evidentiary affidavits from Alexander and Ward. But defendant made this claim in conclusory fashion without any specifics beyond the names of the various prisons, such as the specifics about the timing of his prison moves.

¶ 69    I agree with the majority that defendant's communication with Alexander and Ward would not necessarily be easy despite knowing their whereabouts. See *People v. Collins*, 202 Ill. 2d 59, 68 (2002) (recognizing that the Act's requirement of attaching evidentiary affidavits may, "in some cases, place an unreasonable burden upon post-conviction petitioners"). As the majority hypothesizes, defendant could send a letter to Alexander and Ward while in one location only to be in another location by the time a reply arrived. But without any specifics about the timing of his prison moves and any efforts he made to contact his critical alibi witnesses, the majority can only speculate about the difficulties defendant faced to obtain the affidavits. While it may have

been difficult for defendant, being pro se, to obtain these critical evidentiary affidavits, the burden was on him to explain their absence sufficiently and adequately. Defendant did not do so in this case. See *Harris*, 2019 IL App (4th) 170261, ¶¶ 19-20.

¶ 70    Accepting defendant's conclusory explanation for the absence of the evidentiary affidavits would essentially greenlight the imprisonment-and-indigence excuse as a valid justification for failing to include evidentiary affidavits. Given that most postconviction petitions are filed by pro se defendants and the Act contemplates current imprisonment for postconviction defendants, permitting a mere imprisonment-and-indigence excuse would eviscerate the supporting material requirement and essentially render it meaningless. See *id.* ¶¶ 11, 19. Such countenance would open the floodgates to postconviction petitions lacking supporting material and frustrate the purpose of the Act. Because, under the specific facts of this case, I do not believe defendant adequately or sufficiently explained why he failed to obtain and attach evidentiary affidavits from Alexander and Ward, I would affirm the circuit court's summary dismissal of his postconviction petition. See *Delton*, 227 Ill. 2d at 255.