2022 IL App (1st) 192290

SECOND DIVISION
October 25, 2022

No. 1-19-2290

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 2581 03 |
| | ) | |
| CORTEZ MOORE, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.


**OPINION**

¶ 1    Petitioner Cortez Moore was convicted of home invasion, armed robbery, and aggravated criminal sexual assault. The principal evidence linking him to the crimes was a wallet belonging to one of the victims and a "Scream" mask worn by one of the four assailants. According to the officers, these items were found in petitioner's pocket when he fled the scene and was arrested after a brief chase, less than two blocks from the victims' apartment.

¶ 2    In his postconviction petition, he alleges that the police planted these items on him and committed perjury when they testified otherwise at his trial. In support of this due-process claim, petitioner refers to an alleged affidavit in which one of his codefendants, Rashawn Coleman, is

said to swear that the police found these items on *him* when they arrested him inside the victims'

apartment. But there is no trace of Coleman's alleged affidavit in the record. Notably, the circuit

court's summary dismissal order makes no mention of it.

¶ 3     On appeal, petitioner challenges the summary dismissal of his due-process claim on the

merits. In the alternative, he argues that Coleman's affidavit must have been lost by the clerk's

office, and that its absence from the record, through no fault of his own, denies him his right to

an appeal.

¶ 4                                    BACKGROUND

¶ 5     A brief summary of the underlying crimes and trial evidence will suffice for our limited

purposes here. For more detail, see our decision affirming petitioner's convictions and sentences

on direct appeal. *People v. Moore*, 2017 IL App (1st) 150208-U, ¶¶ 7-40.

¶ 6     Around four o'clock in the morning on January 17, 2011, the four codefendants in this

case—petitioner, Coleman, Ned James, and Henry Sistrunk—broke into the second-floor unit of

a three-flat on the 5700 block of South Wentworth Avenue in Chicago. Three of the assailants

wore masks: two were described as "Halloween" type or "Scream" masks (a reference to the

horror film of that name); the other was a black ski mask. The unmasked man was identified as

Coleman.

¶ 7     Apparently, the assailants thought this was a drug house, though that belief did not hold

up. In their search for money and drugs, they ransacked the apartment and terrorized its

residents. They dragged everyone out of bed and herded them into the kitchen. They beat the two

male occupants, Isaac Andrews and Khalil Cromwell Sr., with a crowbar, among other

implements, and bound them with duct tape. Martitza Morales looked on in horror as she

clutched her (and Cromwell's) infant son. While the other assailants went looking for the

2

"white" or "stuff," and repeatedly threatened to stab everyone if they did not hand it over, Coleman stood guard over the victims with a rifle. He also forced the other female occupant, A.W., to undress, so he could insert his finger into her vagina and make vulgar and demeaning comments about her genitalia. In the end, all the assailants managed to take were the victims' wallets and cell phones, a ring, and some video games.

¶ 8    The assailants were caught red-handed to varying degrees. When the responding officers arrived, Coleman was in the kitchen, beating one of the victims. James was hiding in the rear bedroom, pretending, however farcically, that *he* was one of the victims. The other two men, whom the officers could not identify, barricaded themselves in the front bedroom and locked the door. The officers waited for backup before forcing their way into the bedroom. When they did, the men were gone, and the window—the only other egress in the room—was open.

¶ 9    Outside, more officers were setting up a perimeter around the building. One of them saw Sistrunk hanging out of the front window and ordered him back inside. He complied, for the time being; but in short order, Sistrunk evidently jumped from the window and was found crawling on the ground, 20 or 30 feet from the building, with serious injuries. He died before the trial.

¶ 10    The building was surrounded by vacant lots, and the officers saw only one other person in the vicinity: petitioner. He came running around the south side of the building, from the front, where he came within feet of Officer Powell. He made eye contact, did an abrupt about-face, and ran back toward Wentworth Avenue. Officer Polonio saw him there and chased him northbound on Wentworth. Officers Griggs and Calhoun joined the chase in their squadrol. About a block and a half north of the victims' building, petitioner slipped and fell on a patch of ice in an empty lot, where he was detained and searched. Officer Calhoun testified that she never lost sight of petitioner, from the time she first saw him directly in front of the victims' building, to the time he

was detained in the vacant lot. Officer Griggs recovered A.W.'s wallet and a "Scream" mask from petitioner's right front pocket.

¶ 11    These items, along with petitioner's flight, were the sum total of the evidence against him. Petitioner did not testify or present any other evidence in his defense. Trial counsel argued in closing that the fourth assailant must have slipped away from the officers, and hence they grabbed petitioner, who happened to be walking in the area, and falsely claimed to find the wallet and mask on him.

¶ 12    The postconviction petition returns to this theme and alleges, among other claims no longer at issue, a due-process violation: specifically, the police planted evidence on petitioner and committed perjury when they testified at trial that these items were in his pocket. In fact, the petition claims, these items "were originally seized from Rashawn Coleman" and later falsely associated with petitioner. Accompanying this particular allegation, made twice in the petition, is the following citation: "(See Affidavit of Rashawn Coleman, attached and incorporated herein as Defendant's Exhibit    )." In both instances, a space has clearly been left between the word "Exhibit" and the final parenthesis, as if to leave room for an identifying number or letter.

¶ 13    But there is no affidavit from Coleman in the record. Apart from the verification affidavit, the only document attached is petitioner's own substantive affidavit, captioned "sworn statement of Cortez Moore," labeled "Exhibit A" on a cover page, and cited as such in the petition proper. We will refer to this document as "petitioner's affidavit" from now on.

¶ 14    In his own affidavit, petitioner swore that he was at a friend's birthday party on the night in question, in an apartment complex at South Normal Avenue and Stewart Street. (He named a few partygoers as potential alibi witnesses but did not provide an affidavit from any of them.) At the party, petitioner consumed "a lot" of alcohol and cannabis, as did everyone else. He left

between 3:15 and 3:30 a.m. and set out, on foot, for his brother's place, where he stayed at the time, on 59th Street and Michigan Avenue.

¶ 15    Rather than sobering up on the walk home, petitioner's "high seemed to intensify." So he stopped at a gas station on Garfield Boulevard and Wells Street—only a couple of blocks away from the victims' apartment—for coffee and something to eat. After leaving, he was "swarmed" by officers who beat him and drove him to a nearby residence, where he had never been, and where he encountered two other men in handcuffs, whom he had "never seen before in [his] life." He denied running from the police when he first encountered them.

¶ 16    Petitioner claims he was taken to the hospital for treatment of his injuries—a recent gunshot wound, and some fresh injuries inflicted by the police—and later to the station. There, "the arresting officer" asked another officer, "Which evidence is his?" At that point, the second officer picked up a "Scream" mask and a wallet that petitioner "had never possessed or seen in [his] life." The trial exhibits include a photo of these items sitting on a terrazzo floor, apparently at the station. Petitioner categorically denied any involvement in, or knowledge of, these crimes.

¶ 17    The circuit court summarily dismissed the petition, finding that its claims were "waived" because petitioner could have, but did not, raise them on direct appeal and that, waiver aside, the allegations were "conclusory, unsupported and at times inaccurate."

¶ 18                              ANALYSIS

¶ 19                                  I

¶ 20    The lead issue on appeal is whether the petition and supporting evidence, liberally construed and taken as true, present an arguable claim that petitioner's right to due process was violated by the State's use of allegedly perjured testimony at trial. See, *e.g.*, *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009) (standard for advancing petition to second stage). We review this legal

question *de novo*. *Id.* at 9. Specifically, petitioner alleges that Officer Calhoun committed perjury by falsely testifying that the "Scream" mask and A.W.'s wallet were found in petitioner's pocket, when in fact they were found on Rashawn Coleman and later falsely associated with petitioner at the police station.

¶ 21 An affidavit from Coleman attesting that the "Scream" mask and A.W.'s wallet were found in *Coleman's* possession, if taken as true, would undoubtedly provide some objective corroboration of petitioner's allegations. And the petition does indeed cite a purported affidavit from Coleman to this effect. But as noted, there is no trace of any such affidavit in the record.

¶ 22 Petitioner argues that his petition should advance even without the Coleman affidavit, because he filed his own substantive affidavit, and that affidavit suffices. The State disagrees that petitioner's own affidavit suffices and goes further, arguing that, even if the Coleman affidavit had been attached to the petition and contained the substantive information that petitioner claims it contains, the Coleman affidavit would likewise be insufficient to advance the petition.

¶ 23 For the reasons we set out below, we disagree on both points. Petitioner's own affidavit, by itself, is insufficient to advance this petition. But the Coleman affidavit, if it exists and contains the substantive information petitioner claims, would be enough to advance this petition for second-stage proceedings.

¶ 24                                      A

¶ 25 We begin with the sufficiency of petitioner's own substantive affidavit. Section 122-2 of the Post-Conviction Hearing Act requires that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2020). This purpose of this requirement is twofold: to establish that the allegations are "capable of objective or independent corroboration," or else

explain why they are not, and to identify "the sources, character, and availability" of the alleged supporting evidence. (Internal quotation marks omitted.) *People v. Allen*, 2015 IL 113135, ¶ 32; *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008); *Hodges*, 234 Ill. 2d at 10. Thus, "a *pro se* petition *** must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent." *Delton*, 227 Ill. 2d at 254-55. The failure to provide objective corroboration or explain its absence "by itself justifies the petition's summary dismissal." *People v. Collins*, 202 Ill. 2d 59, 66 (2002).

¶ 26    Does a petitioner's own evidentiary affidavit (as opposed to a verification affidavit (see *id.* at 67)) satisfy the requirement and underlying purposes of section 122-2? Sometimes it does. For example, when "the only affidavit that petitioner could possibly have furnished, other than his own sworn statement, would have been that of his attorney," whose ineffectiveness is being alleged, then the petitioner's affidavit, attesting to the private attorney-client communications at issue, will suffice. (Internal quotation marks omitted.) *Id.* at 68; *People v. Rogers*, 372 Ill. App. 3d 859, 864 (2007). The point of this rule from *Collins* is obviously not that a petitioner's own affidavit generally provides "objective or independent corroboration" of the petition's allegations but rather that, in these particular circumstances, the petitioner has adequately explained why no such corroboration is reasonably available to him, at least not until he can compel his attorney to testify under oath at a hearing.

¶ 27    Petitioner asserts in his brief that "no authority" precludes the use of his own affidavit to satisfy the requirements of section 122-2. But the rule from *Collins* effectively does just that, by identifying specific, limited circumstances in which the absence of "objective or independent" corroboration—that is, evidence from a source other than the petitioner—will be excused. A perfectly general rule that a petitioner's own affidavit satisfies section 122-2 would render that

7

section all but meaningless. A petitioner could easily satisfy that requirement by transcribing the allegations in his petition into another document called an affidavit. But this trivial exercise does not demonstrate that the allegations are "capable of objective or independent corroboration." (Internal quotation marks omitted.) See *Allen*, 2015 IL 113135, ¶ 32.

¶ 28     As far as we know, our supreme court has not yet applied the rule from *Collins* to any circumstances other than private attorney-client communications. There may very well be other circumstances in which this rule should be applied, on the ground that the petitioner could not reasonably be expected to obtain an affidavit from the only other party (or parties) who could potentially provide one. (Certain allegations of police misconduct, occurring entirely behind closed doors, would seem to be potential candidates.) But those circumstances are not present here, so we need not explore the general point any further.

¶ 29     Far from supporting a reasonable inference that nobody could be expected to corroborate petitioner's allegations at this juncture (or more precisely, nobody except the officers who allegedly framed him and committed perjury), the petition identifies a source of independent corroboration: Coleman. (Though of course, Coleman's affidavit is not in the record.) Thus, the petition contains neither independently corroborating evidence nor an adequate explanation of why no such evidence is available.

¶ 30     All of which is to say that, as things currently stand, the sole corroboration of petitioner's own affidavit is not sufficient to advance this petition to the second stage.

¶ 31                                          B

¶ 32     Ordinarily, that would take us to the next question—petitioner's claim that the Coleman affidavit must have been lost, presumably by the clerk's office, thereby denying him his right to an appeal. But the State tries to preempt that argument, claiming that, even if the petition had

attached the Coleman affidavit, and even if that affidavit contained the substantive information the petition claims it does, the postconviction petition would fail at the first stage, anyway.

¶ 33    In support, the State offers a slew of arguments, both procedural and substantive. The procedural arguments—forfeiture (which the State incorrectly calls waiver) and *res judicata*— have no merit, so we will be brief.

¶ 34    A postconviction claim is forfeited only if it could have been raised on direct appeal but was not. *People v. Tate*, 2012 IL 112214, ¶ 8. There was no evidentiary basis for petitioner's claim in the trial record, and as a result, the claim is based on new evidence *outside* the trial record that he could not have submitted on direct appeal. See *id.* ¶¶ 14-15. (It is no objection that that his affidavit is insufficient under section 122-2; that is a substantive failure, not a procedural bar arising from a prior proceeding.) Thus, petitioner could not have raised this claim on direct appeal.

¶ 35    So it should come as no surprise that he did not. And that means the claim is not subject to *res judicata* either, which bars only those claims that were "actually decided" on direct appeal. See *People v. Harris*, 206 Ill. 2d 1, 42 (2002).

¶ 36    The State asserts that the "crux" of the claim was decided in the context of admittedly *other* direct-appeal issues: namely, whether the State's improper opening statement warranted a new trial, and whether the trial court improperly penalized petitioner for professing his innocence at sentencing. See *Moore*, 2017 IL App (1st) 150208-U, ¶¶ 59-64, 143-46. True, these issues overlap, to some degree, with petitioner's due-process claim. But claims that are merely "similar," yet distinct, are not barred by *res judicata*. *Harris*, 206 Ill. 2d at 42.

¶ 37    As for substance, the State does not (and cannot reasonably) dispute that the knowing use of false testimony violates due process and that an officer's perjury is imputed to the State,

regardless of whether the prosecutor trying the case knew that the testimony was false. *United States v. Agurs*, 427 U.S. 97, 103 (1976); *People v. Olinger*, 176 Ill. 2d 326, 345 (1997); *People v. Brown*, 169 Ill. 2d 94, 103 (1995). Thus, if the officers falsely testified that A.W.'s wallet and one of the "Scream" masks were found on petitioner at the time of his arrest—when in fact they were found on Coleman, inside the victims' apartment—the due-process violation would be clear as day.

¶ 38      A due-process claim also requires a showing of prejudice—a reasonable likelihood that the perjured testimony affected the jury's verdict. *Olinger*, 176 Ill. 2d at 345. At the first stage, petitioner need only show arguable prejudice. *Hodges*, 234 Ill. 2d at 16-17 (applying "arguable" prejudice standard to *Strickland* claim at first stage). But an affidavit from Coleman, taken as true at the first stage, would far exceed this low threshold standard and would undeniably require a credibility assessment to be made after a third-stage hearing.

¶ 39      The evidence found in petitioner's pocket was the lynchpin of the State's case against him; it was primarily this evidence that led us to say, on direct appeal, that he was caught "red-handed." *Moore*, 2017 IL App (1st) 150208-U, ¶ 59. Without this evidence, the State had nothing more than his flight to link him to these crimes. Unlike the other codefendants, the police never saw him inside (or hanging from a window of) the apartment; he was not identified by any of the victims; and unlike James, there was no forensic evidence linking him to any of the masks or stolen property. *Id.* ¶¶ 28, 32.

¶ 40      It may be true, as the State argues, that petitioner's flight from the scene, in the particular circumstances of this case, was "sufficient" evidence for a conviction. But that is not the question. The question is whether our confidence in the verdict would be undermined if, in fact, it were true that the police planted the mask and victim's wallet on petitioner. And the answer to

that question is obvious—of course our confidence would be undermined.

¶ 41    The State further asserts that "a clear reading of the record negates the factual premise of petitioner's claim." In particular, Officer Randall testified that Coleman was wearing the black ski mask, not one of the "Scream" masks, when the officer entered the apartment and saw Coleman beating one of the victims in the kitchen. When Randall ordered Coleman to stop, Coleman took off the black ski mask and threw it into one of the bedrooms. The State's point, we suppose, is that Coleman never had the "Scream" mask in his possession.

¶ 42    This testimony, and the State's argument, is irrelevant at the first stage. We are required to take the allegations and supporting evidence as true. *Hodges*, 234 Ill. 2d at 10. Granted, they contradict the trial evidence in various ways, as the State points out. But that's the whole point: new exculpatory evidence—whether it is presented under the rubric of actual innocence or a due-process violation based on the use of false evidence at trial—will always contradict at least some of the apparent evidence of guilt. *People v. Robinson*, 2020 IL 123849, ¶ 57. The State would have us assume that the trial evidence was correct, and thus that the new evidence is false. That is exactly the reverse of how first-stage postconviction proceedings are supposed to work. And it would render such proceedings "pointless." *Id.*

¶ 43    We will take the trial evidence as true only when it "positively rebut[s]" the new evidence. *Id.* ¶ 59. But it bears emphasis that "recognizing the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted," which requires it to "be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible," for instance, by clear forensic or other scientific evidence. *Id.* ¶ 60.

¶ 44    So to the extent that the State argues that the trial evidence "negates the factual premise

11

of petitioner's claim," which is merely another way of saying that the trial record "positively rebuts" the petition's allegations, the State is misapplying this standard. Testimony from an eyewitness, be it a police officer or a civilian, generally fails to meet the requirements for a positive rebuttal. And that is especially true when the testimony in question contradicts the testimony of other eyewitnesses—never mind the new evidence on collateral review. Notably, here, while Officer Randall testified that he saw Coleman with the ski mask, the victims testified that Coleman was the one assailant who did not wear *any* mask. Did the assailants, for whatever reason, switch up their masks? Was Officer Randall simply mistaken? The point is that these are the kinds of questions, arising from conflicting evidence, that can only be resolved after a hearing. Officer Randall's trial testimony does not "positively rebut" anything for purposes of first-stage consideration.

¶ 45 In sum, petitioner's own affidavit, by itself, is insufficient to warrant second-stage proceedings. But the addition of the Coleman affidavit, if it exists, and if it contains the promised substantive information, would almost surely be sufficient to advance this petition beyond the first stage. But because the affidavit is absent from the record, and because it almost certainly was not before the circuit court—given that the summary dismissal order makes no mention of it—we cannot fault the circuit court for deeming the allegations "unsupported." Thus, we cannot reverse the summary dismissal order on the merits.

¶ 46 But because petitioner would undoubtedly be prejudiced if the affidavit was, in fact, lost through no fault of his own, we must take a closer look at the circumstances surrounding its absence. This brings us to petitioner's second appellate argument.

¶ 47                                                    II

¶ 48 In the alternative, petitioner argues that the absence of Coleman's alleged affidavit from

the record denies him an opportunity for meaningful review of his claim and thus denies him his right to an appeal. See Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Petitioner acknowledges that, as the appellant, it is generally his burden to present a record adequate to support his claim of error. *People v. Sims*, 403 Ill. App. 3d 9, 15 (2010).

¶ 49    But as he notes, this rule may be relaxed if he can show that the record is incomplete through no fault of his own, and that there is a "colorable need" for the missing portion of the record in order to obtain appellate review. *People v. Appelgren*, 377 Ill. App. 3d 137, 142-43 (2007). Petitioner fails to satisfy the first requirement. He has not shown that Coleman's affidavit was in fact attached to his petition, and that it was lost, through no fault of his own, by someone in the circuit court clerk's office.

¶ 50    We begin with what we know, with any measure of certainty, about Coleman's purported affidavit. First, the petition includes two citations of the following form: "(See Affidavit of Rashawn Coleman, attached and incorporated herein as Defendant's Exhibit)." Second, there is no such affidavit in the record. Third, the purported affidavit was never seen by the judge. We are confident of this, because the summary dismissal order makes no mention of the affidavit; rather, it simply says that petitioner "failed to support his allegation [that the mask and wallet were found on Coleman and planted on petitioner] with evidence." It is all but impossible to believe that an affidavit from Coleman, attesting to these very facts, would go unremarked in this context, had it actually made its way to the judge's desk.

¶ 51    Thus, petitioner's theory must be that the affidavit was lost by the clerk's office *before* the petition was given to the judge to review. (Indeed, petitioner seems to acknowledge this in his reply brief, referencing "the clerk's mishandling of the petition.") Petitioner argues that this inference is supported by the citations in the petition, the petition's state of "disarray" in the

record prepared for appeal, and appellate counsel's own representations to this court about his efforts to obtain a duplicate copy of Coleman's affidavit.

¶ 52     The citations, reproduced above, are oddly incomplete. In both instances, petitioner left a conspicuous space after the word "Exhibit," where one would expect an exhibit label, like "A," or "B," or "1," or "2," etc., to appear. The petition refers to the only exhibit we know for sure to be attached—petitioner's own affidavit—as "Exhibit A," and that affidavit comes complete with a cover page labelling it "Exhibit A." Why not just refer to the Coleman affidavit as "Exhibit B?"

¶ 53     That is what we would expect if petitioner actually had Coleman's affidavit. The State thus argues that petitioner may have been *expecting* an affidavit from Coleman, as he was drafting his petition, but never actually received one. That is certainly possible, even plausible, but we cannot know for sure. We do know that petitioner would have no reason to leave these blank spaces if he actually had Coleman's affidavit in hand. While that is not grounds for a firm conclusion one way or another, it is, at least, grounds for skepticism that petitioner received an affidavit from Coleman. And that alone is a problem for petitioner, since it is his burden to show that the affidavit was attached and has gone missing through no fault of his own. *Id.* at 143.

¶ 54     Next, petitioner notes that, in the electronic record prepared for this appeal, the scanned copy of the petition is in "disarray." Specifically, some pages appear in duplicate, some are out of order, and others are sideways or upside down. This, he says, "suggest[s] carelessness in handling the petition" and thus supports an inference that the petition, as it appears in the record, is "incomplete."

¶ 55     That inference would be stronger if anything (else) was actually *missing*, but the petition proper, along with petitioner's verification and substantive affidavits, are complete. Granted, the scanning of the petition was not as orderly as it could have been. But that does not show that key

14

evidence was lost.

¶ 56     For the reasons we have noted, it is exceedingly difficult to believe that an affidavit from Coleman was ever put before the circuit court; thus, if the affidavit was lost by the clerk's office, it must have been lost before the judge ruled on the petition. But the "disarray" in the electronic record reflects, at most, "mishandling" of the petition later on, when the record was prepared for appeal. Petitioner fails to explain how *that* could account for the absence of the affidavit at the point of the review by the judge. Thus, the "disarray" in the electronic record provides little or no basis for inferring that an affidavit from Coleman was attached when the petition was originally filed in the circuit court.

¶ 57     Lastly, in the opening brief, appellate counsel details the steps he has taken to obtain a duplicate copy of Coleman's affidavit. We accept that appellate counsel has made these representations in good faith. All the same, they fall short of establishing that an affidavit from Coleman was attached to the petition when it was sent to the circuit court.

¶ 58     For example, appellate counsel informs us that "[a] check of the trial court's file also shows the affidavit missing." That is obviously not proof that the affidavit was ever submitted to the court to begin with. Appellate counsel contacted Coleman's sister, "who helped prepare the affidavit, but she has no copy of the document." Coleman's sister may well have helped him draft an affidavit, but what she did not confirm is that an affidavit was actually turned over to petitioner.

¶ 59     Particularly telling in this regard is the fact that appellate counsel "contacted Coleman's lawyer on a pending postconviction petition, in the hopes of locating or recreating the affidavit, without success." One wonders why Coleman's attorney (or sister) couldn't have him resend or recreate the affidavit. Was it, perhaps, because the attorney advised Coleman not to incriminate

himself in a sworn affidavit while his own petition was pending? And was that advice dispensed to Coleman before he ever sent an affidavit in the first place? If the answer to these questions is yes—and appellate counsel's representations do not establish otherwise—then for all practical purposes, there is not, and never has been, any Coleman affidavit to speak of. To be clear, we do not put this forward as established fact; we note only that appellate counsel's representations so far leave open various possibilities and thus fall short of carrying petitioner's burden.

¶ 60    Petitioner, we are told, had a copy of the affidavit in his legal files, but those files were "discarded" by the Department of Corrections. This assertion is not an allegation made in the postconviction petition. Nor is it an averment in an affidavit. It is a statement that petitioner reportedly made to his appellate lawyer, and one that appellate counsel was not likely in a position to verify, apart from his client's say-so. So we are not bound to take this assertion as true. (Though we do not question appellate counsel's representation that petitioner said this.) And this assertion alone, with no presumption of truth, does not establish that an affidavit from Coleman was attached to the petition, particularly when all the pieces of the puzzle, as they have been presented to us, are put together.

¶ 61    To put those pieces together, petitioner's claim amounts to this: petitioner attached Coleman's affidavit to his petition but left conspicuous blanks in his citations to it for unexplained reasons; someone in the circuit court clerk's office lost this one key piece of evidence before the otherwise complete petition made its way to the judge's desk, leaving no trace of it anywhere in the record; the Department of Corrections threw away petitioner's legal files sometime between then and now; and though the matter has been discussed with Coleman's sister and attorney, there is an unexplained barrier to obtaining a new copy of an affidavit that Coleman, for his part, has been perfectly willing to provide.

¶ 62     In short, there is no evidence clearly establishing that Coleman's alleged affidavit was attached to the petition filed in the circuit court. For all we have been told, we cannot confidently conclude that Coleman ever provided petitioner with an affidavit or that he would be willing to provide one—or testify at a hearing—now. And because the burden lies with petitioner on this issue, as we noted above, this means that his claim must fail.

¶ 63     These circumstances clearly distinguish petitioner's case from the authorities he cites, in which the records were found to be incomplete through no fault of the appellants. In *Appelgren*, 377 Ill. App. 3d at 143, a key exhibit was lost, but there was no dispute that the exhibit had been admitted at trial; not only is a fact like that evident from the trial transcript, the clerk of the court also conceded it in an affidavit. In *People v. Stark*, 33 Ill. 2d 616, 621-22 (1966), a transcript of a preliminary hearing was lost, but there was no question that the preliminary hearing had in fact been held. And in *People v. Ramos*, 295 Ill. App. 3d 522, 525-27 (1998), the court reporter's stenographic notes from the bench trial were lost, making it impossible to generate a transcript. But nobody was left to wonder on appeal whether a trial had actually taken place. Here, the very existence of Coleman's alleged affidavit remains an open question.

¶ 64     Because petitioner has failed to carry his burden, and because his claim does not warrant second-stage proceedings without an affidavit from Coleman, we affirm the summary dismissal order.

¶ 65                                              III

¶ 66     Obviously, we cannot definitively rule out the possibility, however remote it may seem at this juncture, that Coleman's alleged affidavit existed and was attached to the postconviction petition but was lost through no fault of petitioner.

¶ 67     If petitioner can actually show this to be the case—by producing a fresh affidavit in

which Coleman repeats his claims about the mask and wallet and further states that he previously gave petitioner an affidavit to this effect—then petitioner's due-process claim, raised in a subsequent postconviction petition, will still warrant second-stage proceedings, for the same reasons we have given here. Which is just to say that petitioner will not be left empty-handed if he can secure such an affidavit from Coleman. Until that time, his due-process claim remains uncorroborated.

¶ 68                                CONCLUSION

¶ 69     The judgment of the circuit court is affirmed.

¶ 70     Affirmed.

---

*People v. Moore*, **2022 IL App (1st) 192290**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11-CR-2581(03); the Hon. Diana L. Kenworthy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jonathan Krieger, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas P. Harvath, Hareena Meghani-Wakely, and Andrew D. Yassan, Assistant State's Attorneys, of counsel), for the People. |

---