2023 IL App (1st) 221925-U
Order filed: October 26, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-1925

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 08 CR 17442 |
| | ) | |
| EMANUEL WILEY, | ) | Honorable |
| | ) | Anjana M.J. Hansen, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant appealed the second-stage dismissal of his amended successive postconviction petition asserting claims of actual innocence, subornation of perjury, and a *Brady* violation. We affirmed in part, reversed in part, and remanded.

¶ 2    Defendant, Emanuel Wiley, appeals the second-stage dismissal of his amended successive postconviction petition which asserted claims of actual innocence, subornation of perjury, and a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We affirm the dismissal of one of defendant's actual innocence claims and four of his subornation of perjury claims. We reverse and remand for

a third-stage evidentiary hearing on defendant's remaining actual innocence and subornation of perjury claims, and his claim of a *Brady* violation.

¶ 3    The State charged defendant with attempted murder and aggravated battery with a firearm. At the jury trial, Steven Williams testified that at about 11:15 p.m. on August 16, 2008, his friend, Johnny Parker, drove them to the corner of Lavergne Avenue and Crystal Street, where they saw Keisha Chambers. Chambers approached the driver's side of the automobile and began talking with Parker. Williams then noticed defendant walking toward them while holding a revolver.

¶ 4    As defendant approached their vehicle, Chambers asked him to put the gun away. Defendant told Chambers to shut up or else he would shoot. Defendant then fired four shots at the automobile, shattering the rear window. Williams ducked down and was struck on the lower right side of his back. Parker drove Williams to the hospital, where he spoke to a detective and described defendant as a black male in his late twenties with a low haircut and a skinny build. On August 29, 2008, Williams picked defendant out of a lineup.

¶ 5    Parker similarly testified to driving Williams to Lavergne Avenue and Crystal Street on the evening of August 16, 2008. Chambers approached the automobile and began talking to Parker. Parker saw defendant walking toward them with something shiny in his hand. Chambers asked defendant whether he was holding a gun and he told her to shut up. Defendant then raised his right hand and Parker saw that he had a gun.

¶ 6    Defendant fired a shot and Parker attempted to run him over with the automobile. Defendant jumped to the side and fired a second shot, hitting Williams in the back, and then he fired a third shot that struck the rear window. Parker drove Williams to the hospital and remained outside while Williams was tended to inside the hospital. Parker called Chambers. After talking with her, Parker believed he knew the identity of the shooter.

¶ 7     A female police officer arrived and Parker handed her the phone so that she could speak with Chambers. Parker then spoke with other detectives and gave them a description of defendant similar to the one given by Williams. On August 29, 2008, Parker picked defendant out of a lineup.

¶ 8     Lieutenant Mary Platt testified that she arrived at the hospital around midnight on August 17, 2008, and spoke with Parker, who stated that Chambers knew the shooter's identity. Parker called Chambers and handed the phone to Platt. After speaking with Chambers, Platt began looking for someone named "Real" or "Neal."

¶ 9     Detective Arthur Young went to the hospital at about 1:55 a.m. and spoke with Platt, who told him about her conversation with Chambers. After speaking with Platt, Young knew to look for a person named Real or Neal. Young also spoke with Williams and Parker, who gave descriptions of defendant and stated that the gun used in the shooting was a revolver. Neither Williams nor Parker stated that the shooter had any visible tattoos.

¶ 10    Detective Ruben Weber testified that on August 29, 2008, Williams and Parker separately picked defendant out of a lineup at the police station and identified him as the shooter. Weber identified a photograph of defendant on the day of the lineup that depicted his torso with multiple tattoos. Weber also identified a tattoo of the word "Real" on his left arm, as well as tattoos on his neck and hands.

¶ 11    After the State rested, defendant called Pierra Arrington and Latrice Longstreet, who each testified that defendant was with them at a park at Lavergne and Potomac Avenues on the night of August 16, 2008, into the early morning of August 17, 2008, when they heard gunshots and ran away. Arrington testified she did not see defendant with a gun, she did not see him shooting anybody, and he did not leave her presence until after the gunshots were fired. Longstreet testified that defendant's nickname is "Hell Real."

¶ 12    Following all the evidence, the jury convicted defendant of attempted murder and aggravated battery with a firearm. The trial court sentenced him to a 40-year term of imprisonment for attempted murder, and a concurrent 25-year term for aggravated battery with a firearm.

¶ 13    On direct appeal, defendant argued that the State failed to prove him guilty beyond a reasonable doubt and that his trial counsel provided ineffective assistance. We affirmed. With respect to the sufficiency of the evidence, we noted that pursuant to *People v. Slim*, 127 Ill. 2d 302 (1989), Williams and Parker's identification testimony was sufficient to sustain the conviction because: both men had a good opportunity to view defendant at the time of the crime; they both testified to their high degree of attention; they both gave prior accurate descriptions of defendant; and they both described defendant to police and separately picked him out of a lineup less than two weeks after the shooting  See *People v. Wiley*, 2012 IL App (1st) 113117-U, ¶¶ 44-49. Although neither Williams nor Parker mentioned defendant's tattoos to the police, they explained that their failure to notice defendant's tattoos was because their focus was on his face and on the hand holding the gun. *Id.* ¶ 52. We held that, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant guilty beyond a reasonable doubt. *Id.* ¶ 63.

¶ 14    Defendant then filed a *pro se* postconviction petition and a supplemental *pro se* postconviction petition, alleging that his appellate counsel provided ineffective assistance on direct appeal. The postconviction court dismissed defendant's postconviction and supplemental postconviction petitions at the first stage of the proceedings. On appeal, we affirmed. *People v. Wiley*, 2012 IL App (1st) 141257-U.

¶ 15    On August 22, 2018, defendant filed a motion for leave to file a successive postconviction petition alleging a claim of actual innocence based on the attached affidavits of Chambers and

Kamilah Davis. Chambers attested that in the morning hours on August 17, 2008, she was talking with Parker, who had pulled up in his automobile to Lavergne Avenue and Crystal Street. Maurice Purnell walked toward them with a gun in his hand. Parker began to pull away from the curb, and Purnell fired into the automobile. Purnell then turned toward Chambers and told her not to say anything or else he would shoot her too. Parker subsequently contacted Chambers about the identity of the shooter. Chambers told Parker that she did not want to "get involved with the police but that Maurice Purnell shot them."

¶ 16    Later on August 17, 2008, a female police officer called her on Parker's phone. Chambers told the officer that the shooter was Purnell. Other officers subsequently called her. Chambers told each of those officers that Purnell was the shooter. The officers wanted her to identify defendant as the shooter and testify in court against him, but she refused to do so and she never told any officer that defendant was the shooter.

¶ 17    Chambers attested that she is coming forward with this affidavit and is willing to testify on defendant's behalf because Purnell is now dead and can no longer threaten to harm her or her family.

¶ 18    Kamilah Davis attested that "[o]n the night that the shooting happened and the person got shot," she was on the front porch of her home at 5006 W. Crystal Street. Davis saw a man named Maurice, who everyone calls Reese, "walk up and shoot at the car while they were sitting in it. He kept shooting as the car drove off." The police never contacted her about the shooting, so she "minded [her] business." In June 2018, Davis spoke with defendant's brother, who told her that defendant had been convicted and sentenced for the shooting. Davis agreed to give this affidavit and testify on defendant's behalf.

¶ 19    In addition to asserting a claim of actual innocence based on Chambers' and Davis' affidavits, defendant's successive petition also asserted a claim that the State suborned the perjured testimony of Parker, Williams, Platt, Young, and Weber, each of whom testified "to some extent or another" about Chambers' supposed identification of defendant as the shooter. Defendant also alleged that the State committed a *Brady* violation by failing to disclose that Chambers actually had identified Purnell as the shooter. Finally, defendant asserted a claim of ineffectiveness of appellate counsel and that his sentence was unconstitutional.

¶ 20    The court granted defendant leave to file his successive postconviction petition on December 7, 2018, and the cause advanced to second-stage proceedings.

¶ 21    On June 21, 2021, defendant filed a motion for leave to file an amended successive postconviction petition, which adopted the claims of the earlier petition and added a claim related to double jeopardy and the one-act, one-crime doctrine. The court granted defendant leave to file the amended successive petition on June 24, 2021.

¶ 22    The State filed a motion to dismiss the successive and amended successive postconviction petitions, which the court granted on November 15, 2022. Defendant appeals.

¶ 23    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)) provides a three-stage procedure for criminal defendants to raise constitutional issues about their trial or sentencing that could not have been raised on direct appeal. *People v. Morales*, 2019 IL App (1st) 160225, ¶ 17. At the first stage, the postconviction court evaluates the petition and determines whether it is frivolous or patently without merit. *Id.* If the court determines that the petition is not frivolous or patently without merit, it is docketed for second-stage proceedings, during which counsel can be retained or appointed, and defendant must show that his petition makes a substantial showing of a constitutional violation. *Id.* The State can participate for the first time at the second

stage and either answer the petition or move to dismiss. *Id.* All well-pleaded facts that are not positively rebutted by the original trial record are taken as true and the court does not engage in fact-finding or credibility determinations nor resolve any evidentiary questions. *People v. Velasco*, 2018 IL App (1st) 161683,¶ 90. Our review of a second-stage dismissal is *de novo*. *People v. Minniefield*, 2014 IL App (1st) 130535, ¶ 58.

¶ 24     If the petition makes a substantial showing of a constitutional violation, it advances to the third-stage evidentiary hearing where the postconviction court receives evidence and determines whether defendant is entitled to relief. 725 ILCS 5/122-6 (West 2020). At the third-stage hearing, the court acts as a fact-finder, making credibility findings, determining the admissibility of evidence, and weighing the evidence. *People v. Reed*, 2020 IL 124940, ¶51; *Velasco*, 2018 IL App (1st) 161683, ¶118. We review the court's decision for manifest error. *Reed*, 2020 IL 124940, ¶ 51.

¶ 25     First, defendant argues that the postconviction court erred by dismissing his claim of actual innocence based on Chambers' affidavit. To succeed on a claim of actual innocence, defendant must present newly discovered, material, noncumulative evidence that is so conclusive that it probably would change the result on retrial. *People v. Robinson*, 2020 IL 123849,  ¶ 47. Newly discovered evidence is evidence that was discovered after trial and that defendant could not have discovered earlier through the exercise of due diligence. *Id.* Evidence is material when it is relevant and probative of defendant's innocence. *Id.* Noncumulative evidence adds to the information that the jury heard at trial. *Id.* Finally, the conclusive character element requires defendant to present evidence placing the trial evidence in a different light and undermining the court's confidence in the judgment of guilt. *Id.* ¶ 56. New evidence is conclusive when, after considering it along with the trial evidence, a different result probably would occur. *Id.* ¶ 47. "Probability, rather than

certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* ¶ 48.

¶ 26    Our supreme court also has held that the actual innocence claim must be free-standing, meaning that the newly discovered evidence is not being used to supplement an assertion of a constitutional violation at trial. *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998). Here, defendant offered Chambers' affidavit not only to support his claim of actual innocence but also to support his claims of subornation of perjury and a *Brady* violation. Therefore, the State argues that defendant's actual innocence claim premised on Chambers' affidavit was not free-standing and may not be asserted in the successive petition. See *Hobley*, 182 Ill. 2d at 443-44 (defendant's newly discovered fingerprint evidence, as well as evidence that officers engaged in a pattern and practice of torture, failed to support a free-standing claim of actual innocence as such evidence also was used to supplement his assertions of other constitutional violations); *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 30 (defendant's actual innocence claim based on evidence that the detective had a pattern of coercing and intimidating witnesses in other cases failed, where the same evidence was used to supplement his assertion of a *Brady* violation).

¶ 27    However, in *People v. Martinez*, 2021 IL App (1st) 190490, a division of this court noted that *Hobley* identified no principle or purpose that is furthered by the rule prohibiting a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim. *Id.* ¶ 102. *Martinez* recognized that "[a]rguably, the *Hobley* rule *may* serve a purpose where a defendant seeking leave to file a successive postconviction petition asserts actual innocence to circumvent the cause-and-prejudice test that applies when determining whether a defendant is entitled to leave to file a successive petition." (Emphasis in the original.) *Id.* ¶ 103. However, the case before the *Martinez* court involved the second-stage dismissal of a successive

petition, not the leave-to-file stage, and therefore the court found there was no purpose in prohibiting defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim. *Id.*

¶ 28    The *Martinez* court also held that the *Hobley* rule was inconsistent with the Illinois Supreme Court's more recent pronouncement in *People v. Coleman*, 2013 IL 113307, that "a freestanding actual-innocence claim is independent of any *claims* of constitutional error at trial and focuses solely on a defendant's factual innocence in light of new evidence." (Emphasis added.) *Id.* ¶ 83. The *Martinez* court construed *Coleman* as contemplating that "the *claims* be independent, not that the actual innocence claim be independent of *the evidence* underlying his other constitutional claim or trial error." (Emphasis in the original). *Martinez*, 2021 IL App (1st) 190490, ¶ 104.

¶ 29    The *Martinez* court further noted the supreme court's statement in *Coleman* that "[p]rocedurally, a trial court should treat such [an absolute innocence] claim like any other postconviction claim," meaning that the court should only grant relief if defendant has presented supporting evidence that is new, material, noncumulative, and of such conclusive character that it probably would change the result on retrial. *Coleman*, 2013 IL 113307, ¶ 84. The *Martinez* court determined that *Hobley* effectively imposed an additional requirement: that the evidence underlying the actual innocence claim cannot be used to support any other constitutional claim. *Martinez*, 2021 IL App (1st) 190490, ¶ 105. *Martinez* held that *Hobley*'s additional requirement for raising an actual innocence claim "cannot be reconciled" with *Coleman*. *Id.* ¶ 106.

¶ 30    Recently, in *People v. Mason*, 2023 IL App (1st) 220376-U, ¶ 56[1], we found "no reason to deviate from" *Martinez*'s holding that where a petitioner's freestanding claim of actual innocence is independent of other constitutional claims of error at trial, the evidence supporting the actual innocence claim need not be independent of the evidence underlying his other constitutional claims. We again find no reason to deviate from *Martinez* here.  In the instant case, defendant's actual innocence claim was independent of his other claims of constitutional error and thus was properly asserted in his successive postconviction petition, notwithstanding that the evidence in support thereof also was used in support of his claims of subornation of perjury and a *Brady* violation.

¶ 31    Next, the State argues that defendant's claim of actual innocence fails because Chambers' affidavit was not newly discovered. We disagree. Newly discovered evidence is evidence that could not have been obtained earlier through due diligence and includes testimony that was unavailable at trial because the witness had been threatened or intimidated into not testifying. *People v. Fields*, 2020 IL App (1st) 151735, ¶ 46. Chambers stated in her affidavit that Purnell's threats of harm to her and her family kept her from having "anything to do with this case" until she learned that he had died. Chambers' affidavit is newly discovered because it could not have been obtained earlier due to Purnell's threats against her.

¶ 32    Next, the State argues that Chambers' proposed testimony is not so conclusive as to undermine our confidence in defendant's guilt. In support, the State cites *Robinson*, 2020 IL 123849. In *Robinson*, the petitioner appealed from an order denying him leave to file a successive

---

[1] Rule 23(e) states that "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes." Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023).

postconviction petition alleging actual innocence based on newly discovered evidence. *Id.* ¶ 1. The appellate court affirmed. *Id.* The supreme court noted that the appellate court erred by premising its decision on a "conflicting evidence" standard, *i.e.*, the appellate court held that the evidence in petitioner's supporting affidavits did not satisfy the conclusive character element because it merely conflicted with the evidence at trial. *Id.* ¶ 57. The supreme court stated:

"Although this court has occasionally made reference to the insufficiency of new evidence that conflicts with trial evidence, we have not done so where the relevant inquiry involved a request for leave to file a successive petition based on actual innocence. Rather, those 'conflicting evidence' references were made in cases that decided whether a petition should advance to a third-stage evidentiary hearing [citation] or whether a new trial should be granted following such a hearing [citations]." *Id.* ¶ 58.

¶ 33 The supreme court differentiated an earlier case, *People v. Sanders*, 2016 IL 118123. *Sanders* involved the second-stage dismissal of a successive postconviction petition. *Id.* ¶ 1. *Sanders* held that the new evidence presented there did not make a substantial showing of actual innocence because the new evidence merely added conflicting evidence to the evidence adduced at trial and was not so conclusive as to change the result. *Id.* ¶¶ 52-55. *Sanders* also was premised on the fact that some of the new evidence—an assertion that the victim only had been shot once— was positively rebutted by the autopsy evidence at trial showing that the victim had been shot multiple times. *Id.* ¶ 52. The *Robinson* court held that *Sanders* was inapposite because "[t]he substantial showing required to avoid dismissal at the second stage is greater than the standard that must be satisfied to obtain leave to file a successive petition." *Robinson*, 2020 IL 123849, ¶ 43. *Robinson* further held:

"For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible—like the single-gunshot evidence in *Sanders*. We now clarify that the inquiry applicable at the leave-to-file stage of successive proceedings does not focus on whether the new evidence is inconsistent with the evidence presented at trial. Rather, the well-pleaded allegations in the petition and supporting documents will be accepted as true unless it is affirmatively demonstrated by the record that a trier of fact could never accept their veracity. In assessing whether a petitioner has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial." *Id.* ¶ 60.

¶ 34     *Robinson* teaches that at the leave-to-file stage, the analysis of an actual innocence claim focuses on whether the new evidence, if believed and not positively rebutted, could lead to acquittal. However, at the second stage, the standard for avoiding dismissal of an actual innocence claim is higher: defendant must make a substantial showing that the new evidence, when considered alongside the evidence at trial, probably would lead to a different result.  As at the leave-to-file stage, the new evidence at the second stage must be taken as true unless positively rebutted by the record. The instant case is an appeal from a second-stage dismissal, and therefore we proceed to examine the trial evidence in conjunction with Chambers' new affidavit in order to determine whether defendant made the requisite substantial showing of actual innocence.

¶ 35     The trial evidence showed that Lieutenant Platt testified that she knew to look for defendant (nicknamed Real) after speaking with Chambers on the day of the shooting. Williams and Parker testified to viewing defendant under circumstances permitting a positive identification, and they gave consistent descriptions of defendant to police, separately picked defendant out of a lineup

less than two weeks after the shooting, and identified him in court as the shooter. Also, Detective Weber testified to the lineup identifications. Defendant presented alibi testimony from Arrington and Longstreet and argued that Williams and Parker's failure to tell the officers about his extensive tattoos raised reasonable doubt of his guilt. The jury rejected the alibi defense, found Williams and Parker's identifications of defendant to be credible, and convicted him.

¶ 36    Chambers' new affidavit states that she witnessed the shooting and that Purnell, not defendant, was the shooter. Chambers also states that she identified Purnell to Platt during a phone conversation in the aftermath of the shooting and that she is now ready to testify to Purnell being the sole shooter. Chambers' affidavit is material and not cumulative to the evidence at trial, as no other witness testified to Purnell's involvement. Although Chambers' affidavit is contradicted by the trial testimony of Platt, Williams, and Parker, a conflict with the trial evidence is not the same as finding that the new affidavit is positively rebutted. *Id.* As discussed, to be positively rebutted, the new affidavit must be affirmatively and incontestably demonstrated to be false or impossible such that no juror could accept it as true. *Id.* No such showing has been made here and thus Chambers' affidavit must be accepted as true, leaving us with a conflict in the evidence as to whether defendant or Purnell was the shooter. Chambers' affidavit satisfies the conclusive character element as it places the trial evidence in a different light, undermines this court's confidence in the judgment of guilt, and constitutes a substantial showing of actual innocence.

¶ 37    The second stage of postconviction proceedings is not the stage at which the court may make credibility determinations resolving the conflict between the trial testimony and Chambers' affidavit. Instead, such determinations are reserved for the third-stage evidentiary hearing. Accordingly, we reverse the order dismissing defendant's claim of actual innocence premised on Chambers' affidavit and remand for a third-stage evidentiary hearing, where the court can make

credibility determinations and resolve the conflict in the evidence. See *e.g.*, *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 37 (where a new affidavit supporting defendant's claim of self-defense conflicted with the trial evidence but was not positively rebutted by any evidence in the record, we found that the newly discovered evidence made a substantial showing of actual innocence and we remanded for a third-stage hearing where credibility determinations could be made).

¶ 38    Next, defendant argues that the postconviction court erred by dismissing his claim of actual innocence based on Davis' affidavit, in which she asserted that she was present "[o]n the night that the shooting happened" across the street from her house at 5006 W. Crystal and that she saw a man named Maurice "shoot at the car while they were sitting in it." Defendant argues that Davis' identification of someone other than him was newly discovered, material, and noncumulative evidence that is so conclusive that it probably would change the result on retrial and therefore supports a claim of actual innocence. However, as aptly noted by the State, Davis' affidavit is vague and uncertain as to whether she actually witnessed the shooting at issue here. Davis never identifies the specific date of the shooting she witnessed, stating only that it occurred on a night in 2008. Nor does she identify or describe the victims of the shooting as Williams and Parker or state that she saw Chambers standing next to the automobile at the time of the shooting. Given the lack of corroborating details showing that the shooting Davis witnessed was the same shooting as the one at issue here, we cannot say that her affidavit is of such a conclusive character as to place the evidence in a different light or undermine the court's confidence in defendant's guilt. Accordingly, we affirm the dismissal of defendant's actual innocence claim based on Davis' affidavit.

¶ 39    Next, defendant argues that the postconviction court erred by dismissing his claim of subornation of perjury related to the allegedly false testimony given by Parker, Williams, Platt,

Young, and Weber regarding Chambers' identification of defendant as the shooter. Confusingly, defendant cites the cause-and-prejudice test that must be met to file a successive postconviction petition. However, the instant case is not on appeal from the denial of a successive postconviction petition, rather it is on appeal from the second-stage dismissal of that petition. The cause-and-prejudice test is irrelevant to the issue of whether the dismissal order was erroneous.

¶ 40    Putting aside defendant's irrelevant discussion about the cause-and-prejudice test, we glean from his brief that his perjury claim relies on Chambers' affidavit, in which she attested that she actually identified Purnell, and not defendant, as the shooter to every officer who spoke with her and that she refused their entreaties to identify defendant. Defendant essentially argues that the officers' knowledge of their conversations with Chambers, and their collective decision to misrepresent the substance of those conversations,  must be  imputed to the State.

¶ 41    Defendant's argument with respect to the allegedly perjured testimony of Parker, Williams, Weber, and Young fails for several reasons. First, Parker and Williams testified to their *own* identifications of defendant as the shooter; they never testified that Chambers identified defendant too. Accordingly, defendant's claim that Parker and Williams falsely testified about Chambers' identification of him is absolutely without merit.

¶ 42    Weber only testified to Parker and Williams' lineup identifications of defendant as the shooter. Accordingly, defendant's claim that Weber falsely testified about Chambers' identification of him is without merit.

¶ 43    Young testified only to his conversations with Parker and Platt about the shooting. Defendant makes no argument that Young misrepresented his account of those conversations. Accordingly, any claims of perjury with respect to Young's testimony is without merit.

¶ 44   Defendant's final perjury claim relates to Platt, who testified to the investigatory procedures undertaken following her phone conversation with Chambers, namely, that she knew to look for someone nicknamed Real (*i.e.*, defendant, who had the word Real tattooed on his arm and was known as "Hell Real"). Defendant contends that Platt's testimony was perjurious because Chambers never identified the shooter as Real but instead identified Purnell, and that Platt's knowledge of her false testimony must be imputed to the State.

¶ 45   The State's knowing use of false testimony to obtain a criminal conviction constitutes a violation of due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). " 'In order to establish a violation of due process, the prosecutor actually trying the case need not have known that the testimony was false; rather, knowledge on the part of any representative or agent of the prosecution is enough.'" *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 66 (quoting *Ollinger*, 176 Ill. 2d at 347); *People v. Smith*, 352 Ill. App. 3d 1095, 1101 (2004) (same). The prosecution is charged with knowledge of its agents, which includes the police. *Id.* Thus, "an officer's perjury is imputed to the State, regardless of whether the prosecutor trying the case knew that the testimony was false." *People v. Moore*, 2022 IL App (1st) 192290, ¶ 37. Defendant's conviction must be set aside if there is a reasonable likelihood that the perjured testimony affected the jury's verdict. *Olinger*, 176 Ill. 2d at 345. This standard is equivalent to the harmless error standard. *People v. Lucas*, 203 Ill. 2d 410, 422 (2002).

¶ 46   Chambers' affidavit leaves us with a conflict in the evidence regarding whether Platt testified truthfully about her conversation with Chambers, *i.e.*, whether Platt committed perjury which must be imputed to the State when she testified that after speaking with Chambers she knew to look for "Real." We cannot resolve the conflicting evidence at the second stage, but must accept Chambers' affidavit as true for purposes of our analysis. Accepted as true, Chambers' affidavit

makes a substantial showing that the State committed a due process violation by eliciting Platt's perjured testimony. We cannot say at these second-stage proceedings that the use of Platt's allegedly perjurious testimony was harmless. Platt's testimony identifying Real (defendant) as a suspect in the aftermath of the shooting supported Williams and Parkers' identifications of defendant and conflicted with the alibi testimony provided by Arrington and Longstreet. In the absence of such corroborating testimony from a police officer, the jury may have discounted Williams and Parker's identifications of defendant based on their failure to notice his extensive tattoos and instead credited the alibi testimony placing him at a different location at the time of the shooting. Accordingly, we reverse the second-stage dismissal of defendant's subornation of perjury claim with respect to Platt's testimony and remand for a third-stage hearing thereon.

¶ 47    At the third-stage hearing, the postconviction court no longer will be required to accept the veracity of Chambers' affidavit. The court will make its own credibility assessment and determine whether, in fact, Chambers identified Purnell as the shooter and whether Platt's testimony regarding her conversation with Chambers was perjurious and prejudiced defendant.

¶ 48    Next, we address the dismissal of defendant's allegation of a *Brady* violation related to the State's failure to inform him about Chambers' identification of Purnell as the shooter. In *Brady*, the United States Supreme Court held that the State violated defendant's due process rights by failing to disclose evidence favorable to him and material to guilt or punishment. *Brady*, 373 U.S. at 87. A *Brady* violation is triggered even where the evidence is known only to the police and not to the prosecutor and therefore compliance with *Brady* imposes a duty on the prosecutor to learn of any favorable evidence known to others acting on the State's behalf, including the police. *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).

¶ 49    A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to defendant because it is either exculpatory or impeaching; (2) the State either willfully or inadvertently suppressed the evidence; and (3) defendant was prejudiced because the evidence is material to guilt or punishment. *People v. Beamon*, 229 Ill. 2d 56, 73-74 (2008). Evidence is material where there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *Id.* at 74.

¶ 50    Chambers' affidavit, taken as true for purposes of these second-stage postconviction proceedings, makes a substantial showing of all three *Brady* requirements as it indicates that the State suppressed material evidence favorable to defendant, specifically, her statement to Platt identifying Purnell as the shooter. As we have discussed, Chambers' affidavit conflicts with Platt's testimony; however, credibility determinations may only be made at a third-stage evidentiary hearing. *Sanders*, 2016 IL 118123, ¶ 42. Therefore, we reverse the dismissal of defendant's *Brady* claim and remand for a third-stage evidentiary hearing thereon, during which the court can assess the respective credibility of Chambers and Platt and determine whether a *Brady* violation actually occurred.

¶ 51    Affirmed in part and reversed in part; cause remanded.